**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| COOK COUNTY REPUBLICAN PARTY, | |
| Plaintiff, | No. 20-cv-04676 |
| v. | |
| J.B. PRITZKER, *et al*., | The Honorable Robert M. Dow, Jr. |
| Defendants. | |

**THE GOVERNOR'S MEMORANDUM OF LAW IN SUPPORT OF
HIS MOTION TO DISMISS AND IN OPPOSITION TO
<u>PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION</u>**

Dated: September 4, 2020

KWAME RAOUL
Attorney General of Illinois

Sarah H. Newman
Hal Dworkin
Office of the Illinois Attorney General
100 West Randolph Street
Chicago, Illinois 60601

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

BACKGROUND ................................................................................................... 4

    The Pandemic ................................................................................................ 4

    Voting by Mail in Illinois ............................................................................. 6

    The May Amendments to the Election Code ................................................. 6

    Plaintiff's Claims ........................................................................................... 9

ARGUMENT ....................................................................................................... 11

    I.   Plaintiff's Complaint Should Be Dismissed. ......................................... 11

        A.  Any request for relief regarding the mailing of ballot applications is moot. .............. 11

        B.  Plaintiff lacks standing to bring this lawsuit. ............................... 12

            1.  Plaintiff lacks standing to sue on its own behalf. ................... 13

                a.  Illinois's deadline to request a mail-in ballot five days before the election is not part of the challenged amendments and does not injure Plaintiff. ........ 14

                b.  The Election Code does not injure voters by not requiring that mail-in ballots be tracked. .............................. 16

                c.  The May Amendments do not change the rules regarding "ballot harvesting" and do not injure Plaintiff. .......................... 17

                d.  The requirement that three election judges concur on an invalid signature lessens the likelihood that valid ballots are discarded. ................... 19

                e.  The May Amendments' expansion of allowing all 16 year-olds and older to be election judges does not create an injury. ..................................... 20

                f.  The May Amendments' provision allowing for the disclosure of vote-by-mail lists does not harm anyone. ...................... 20

                g.  The May Amendments' expansion of the Election Day Holiday to all state workers and extension of the provisional ballot deadline do not create an injury. ........................... 21

            2.  Plaintiff lacks standing to sue on behalf of its members. ...................... 22

        C.  The May Amendments are valid under *Jacobson*'s deferential standard for public health emergencies. ................................... 23

        D.  The May Amendments are valid under *Anderson-Burdick* analysis. ......................... 26

            1.  The May Amendments enhance rather than burden the right to vote. ................. 27

            2.  Plaintiff cannot state a claim for vote-dilution disenfranchisement. ................... 29

            3.  Plaintiff cannot state a claim for direct disenfranchisement. .............................. 31

        E.  Plaintiff's claims under the Illinois Constitution are barred under the Eleventh Amendment. ........................... 31

II. Plaintiff's Preliminary Injunction Motion Should Be Denied. .......................................... 32

    A. Plaintiff has no likelihood of success on the merits.................................................... 33

    B. Plaintiff cannot demonstrate irreparable harm............................................................ 34

    C. The balance of harms weighs decidedly against injunctive relief. ............................ 37

CONCLUSION.................................................................................................................... 43

# TABLE OF AUTHORITIES

**Cases**

*Am. Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779 (W.D. Tex. 2015)..................14

*Anderson v. Celebrezze*, 460 U.S. 789 (1983) .......................................................26, 28

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................11

*Baker v. Carr*, 369 U.S. 186 (1962)...................................................................30

*Bannon v. Edgewater Med. Ctr.*, 406 F. Supp. 2d 907 (N.D. Ill. 2005) ...............................11

*Benning v. Bd. of Regents*, 928 F.2d 775 (7th Cir. 1991) ............................................32

*Bodine v. Elkhart Cty. Election Bd.*, 788 F.2d 1270 (7th Cir. 1986) .................................29

*Boucher v. Sch. Bd. of Sch. Dist. of Greenfield*, 134 F.3d 821 (7th Cir. 1998) ..................33, 37

*Burdick v. Takushi*, 504 U.S. 428 (1992)........................................................26, 27, 28

*Cassell v. Snyders*, No. 20 C 50153, 2020 WL 2112374 (N.D. Ill. May 3, 2020) ............ 1, 32, 38

*Common Cause Indiana v. Lawson*, 937 F.3d 944 (7th Cir. 2019) ....................................12

*Council 31 of AFSCME. v. Quinn*, 680 F.3d 875 (7th Cir. 2012)......................................32

*Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949 (7th Cir. 2007)...............................13, 29

*Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181 (2008) .....................................26, 30

*Democracy N. Carolina v. N. Carolina State Bd. of Elections*, No. 1:20CV457,
2020 WL 4484063 (M.D.N.C. Aug. 4, 2020)..........................................................19

*Elim Rom. Pentecostal Church v. Pritzker*, No. 20 C 2782, 2020 WL 2468194
(N.D. Ill. May 13, 2020) ...........................................................................38

*Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341 (7th Cir. 2020) ..................... 1, 24

*Ennenga v. Starns*, 677 F.3d 766 (7th Cir. 2012) ..................................................... 2

*Ezell v. City of Chicago*, 641 F.3d 684 (7th Cir. 2011) ..............................................12

*Fenje v. Feld*, No. 01 C 9684, 2002 WL 1160158 (N.D. Ill. May 29, 2002) ...........................36

*GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357 (7th Cir. 2019)..............................33

*Griffin v. Roupas*, 385 F.3d 1128 (7th Cir. 2004)............................................26, 28, 30

*H.P. by and through W.P. v. Naperville Comm. Unit Sch. Dist. #203*,
910 F.3d 957 (7th Cir. 2018) .......................................................................12

*Harlan v. Scholz*, 866 F.3d 754 (7th Cir. 2017)......................................................34

*Hunt v. Washington State Apple Advertising Com'n*, 432 U.S. 333 (1977). ............................23

*Illinois Clean Energy Community Foundation v. Filan*, No. 03 C 7596, 2
004 WL 1093711 (N.D. Ill. April 30, 2004)..........................................................32

*Illinois Republican Party v. Pritzker*, No. 20-2175, 2020 WL 5246656
(7th Cir. Sept. 3, 2020).....................................................1, 24, 33, 37

*Jacobson v. Massachusetts*, 197 U.S. 11 (1905)..........................................1, 23, 24, 25

*Kartman v. State Farm Mut. Auto. Ins. Co.*, 635 F.3d 883 (7th Cir. 2011) ...........................37

*Lawson Prods., Inc. v. Avnet, Inc*, 782 F.2d 1429 (7th Cir. 1986) ...................................34

*League of Women Voters of N. Carolina v. N. Carolina*, 769 F.3d 224 (4th Cir. 2014).........3, 39

*Libertarian Party of Illinois v. Rednour*, 108 F.3d 768 (7th Cir. 1997) ................................ 26, 27

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .................................................. 23

*Maryland v. King*, 567 U.S. 1301 (2012) .............................................................. 40

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) ........................................................... 32

*McCauley v. City of Chicago*, 671 F.3d 611 (7th Cir. 2011) .......................................... 11

*McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802 (1969) ...................... 6, 27, 28

*Mich. v. U.S. Army Corps of Eng'g*, 667 F.3d 765 (7th Cir. 2011) .................................. 37

*Minn. Voters Alliance v. Ritchie*, 720 F.3d 1029 (8th Cir. 2013) ................................... 29

*Nader v. Keith*, 385 F.3d 729 (7th Cir. 2004) ........................................................ 40

*O'Sullivan v. City of Chicago*, 396 F.3d 843 (7th Cir. 2005) ....................................... 13

*Obama for Am. v. Husted*, 697 F.3d 423 (6th Cir. 2012) ............................................ 3, 39

*OCA-Greater Houston v. Texas*, 867 F.3d 604 (5th Cir. 2017) ...................................... 18

*Ohio Republican Party v. Brunner*, 544 F.3d 711 (6th Cir. 2008) .................................. 29

*Ohio Republican Party v. Brunner*, 555 U.S. 5 (2008) ............................................... 29

*Orr v. Shicker*, 953 F.3d 490 (7th Cir. 2020) ........................................................ 34

*Paher v. Cegavske*, No. 3:20-cv-243, 2020 WL 2089813 (D. Nev. Apr. 30, 2020) .............. 39, 42

*Paher v. Cegavske*, No. 3:20-cv-243, 2020 WL 2748301 (D. Nev. May 27, 2020) ....... 13, 29, 40

*Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89 (1984) .............................. 31, 32

*People First of Alabama v. Sec'y of State for Alabama*, No. 20-12184,
2020 WL 3478093 (11th Cir. June 25, 2020) ..................................................... 36, 38

*Perhats Assocs., Inc. v. Fasco Indus., Inc.*, 843 F. Supp. 424 (N.D. Ill. 1994) ................... 16

*Pettengill v. Putnam Cty. R-1 Sch. Dist., Unionville, Mo.*, 472 F.2d 121 (8th Cir. 1973) ........... 29

*Priorities USA v. Nessel*, No. 19-13341, 2020 WL 2615766 (E.D. Mich. May 22, 2020) .......... 19

*Proft v. Madigan*, 340 F. Supp. 3d 683 (N.D. Ill. 2018) ............................................. 40

*Proft v. Raoul*, 944 F.3d 686 (7th Cir. 2019) ........................................................ 40

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) ............................................................ 29, 43

*Remer v. Burlington Area Sch. Dist.*, 205 F.3d 990 (7th Cir. 2000) ................................ 11

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205 (2020) ..................... 43

*Republican Party of Pa. v. Cortés*, 218 F. Supp. 3d 396 (E.D. Pa. 2016) ......................... 29

*Reynolds v. Sims*, 377 U.S. 533 (1964) .............................................................. 29

*Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380 (7th Cir. 1984) .......................... 34

*Scheuer v. Rhodes*, 416 U.S. 232 (1974) ............................................................. 11

*Republican Nat. Comm. v. Common Cause RI*, No. 20A28,
2020 WL 4680151 (U.S. Aug. 13, 2020) ............................................................ 30

*Shady v. Tyson*, 5 F. Supp. 2d 102 (E.D.N.Y. 1998) ................................................ 36

*Shelby County, Ala. v. Holder*, 133 S. Ct. 2612 (2013) .............................................. 26

*Short v. Brown*, 893 F.3d 671 (9th Cir. 2018) ........................................................ 29

*Smith v. Avino*, 91 F.3d 105 (11th Cir. 1996) ........................................................ 25

*South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) ..................... 1, 24

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998)........................................................ 25

*Summers v. Earth Island Institute*, 555 U.S. 488 (2009) ............................................... 12, 13

*Summers v. Smart,* 65 F. Supp. 3d 556 (N.D. Ill. 2014)................................................................ 43

*Thomas v. Andino*, No. 3:20-CV-01552, 2020 WL 2617329 (D.S.C. May 25, 2020) ................ 38

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997) ........................................... 26, 27

*Travis v. Illinois Dep't of Corr.*, No. 18 C 00282,
    2019 WL 2576546 (N.D. Ill. June 24, 2019) .................................................................. 32

*Tripp v. Smart*, No. 14-CV-0890, 2014 WL 4457200 (S.D. Ill. Sept. 10, 2014)........................ 40

*United States v. Chalk*, 441 F.2d 1277 (4th Cir. 1971).................................................................. 25

*United States v. Hays*, 515 U.S. 737 (1995) ................................................................................. 13

*United States v. Saylor*, 322 U.S. 385 (1944) ............................................................................... 30

*Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635 (2002)............................. 31

*Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008)............................. 30

*Watkins v. Blinzinger*, 789 F.2d 474 (7th Cir. 1986) .................................................................. 32

*Wesberry v. Sanders*, 376 U.S. 1 (1964)....................................................................................... 30

*Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483 (1955) ........................................... 28

*Winter v. Natural Res. Def. Council*, 555 U.S. 7 (2008) ............................................................. 33

**Statutes**

10 ILCS 5/2B-15 ....................................................................................................................... 7, 17

10 ILCS 5/13-4 .............................................................................................................................. 20

10 ILCS 5/16-5.01 ......................................................................................................................... 41

10 ILCS 5/17-12 ............................................................................................................................ 21

10 ILCS 5/17-25 ........................................................................................................................ 7, 21

10 ILCS 5/19-1 ................................................................................................................................ 6

10 ILCS 5/19-2 ........................................................................................................................ 10, 15

10 ILCS 5/19-4 ........................................................................................................................ 21, 41

10 ILCS 5/19-5 .............................................................................................................................. 21

10 ILCS 5/19-6 .............................................................................................................................. 18

10 ILCS 5/19-8 ............................................................................................................ 15, 16, 19, 20

10 ILCS 5/19A-40 ......................................................................................................................... 21

10 ILCS 5/2B-1 .......................................................................................................................... 6, 25

10 ILCS 5/2B-10 .................................................................................................................. 7, 21, 41

10 ILCS 5/2B-15 ...................................................................................................................... 12, 14

10 ILCS 5/2B-20 ..................................................................................................................... passim

10 ILCS 5/2B-25 .............................................................................................................................. 8

10 ILCS 5/2B-30 .............................................................................................................................. 8

10 ILCS 5/2B-35 .................................................................................................................. 8, 15, 22

10 ILCS 5/2B-40 ........................................................................................ 8, 20, 42

10 ILCS 5/2B-45 ................................................................................................. 8

10 ILCS 5/2B-5 .................................................................................................. 6

10 ILCS 5/2B-50 ................................................................................................. 9

10 ILCS 5/2B-55 ................................................................................................. 9

10 ILCS 5/2B-60 ................................................................................................. 9

625 ILCS 5/6-107 ............................................................................................. 20

42 U.S.C. § 1973ff-1 ........................................................................................ 41

52 U.S.C. § 10508 ............................................................................................ 18

P.A. 86-873 ...................................................................................................... 21

P.A. 93-1082 .................................................................................................... 39

P.A. 94-637 ........................................................................................................ 6

P.A. 95-440 ........................................................................................................ 6

P.A. 96-441 ...................................................................................................... 39

P.A. 96-553 ........................................................................................................ 6

P.A. 97-766 ...................................................................................................... 39

P.A. 98-1171 .................................................................................................... 39

## Other Authorities

*A Sampling of Recent Election Fraud Cases from Across the United States*,
    THE HERITAGE FOUNDATION ................................................................. 36

*Alternative Voting Methods: September 2008,* U.S. ELECTION ASSISTANCE COMM'N ................ 7

*Considerations for Election Polling Locations and Voters: Interim guidance to prevent*
    *spread of coronavirus disease 2019 (COVID-19)*, CENTERS FOR DISEASE CONTROL ........ 2

*COVID-19 Statistics*, ILL. DEP'T OF PUB. HEALTH ............................................ 4

Craig Wall, *Chicago Election Board facing 'monumental obstacles'; governor says*
    *election will not be delayed*, ABC-7 EYEWITNESS NEWS (Mar. 15, 2020) ....................... 5

Dr. Caitlin Rivers, *Coronavirus Is Not Done with Us Until We Have a Vaccine for*
    *COVID-19: Q&A*, USA TODAY (June 17, 2020) ................................................. 4

*Election Fraud Cases*, THE HERITAGE FOUNDATION ............................................ 36

Kelli Smith, '*We're in uncharted waters:' Illinois counties rush to finalize early voting*
    *sites*, CHICAGO TRIBUNE (Aug. 25, 2020) ...................................................... 41

Letter from Kenneth R. Menzel, General Counsel, Illinois State Board of Elections, to the
    Hon. Kris W. Kobach, Vice Chair, Presidential Advisory Commission on Election
    Integrity (Sept. 19, 2017) ...................................................................... 35

*See Election Poll Workers*, NATIONAL CONFERENCE OF STATE LEGISLATURES ..................... 20

Wendy R. Weiser and Harold Ekeh, *The False Narrative of Vote by Mail Fraud*,
    BRENNAN CENTER FOR JUSTICE (April 10, 2020) ............................................. 35

*WHO Coronavirus Disease (COVID-19) Dashboard*, WORLD HEALTH ORGANIZATION ............. 4

**Rules**

Fed. R. Civ. P. 12 .................................................................................................................. 11

Fed. R. Evid. 101 ................................................................................................................... 2

Fed. R. Evid. 201 ................................................................................................................... 2

Fed. R. Evid. 902 ................................................................................................................... 2

## INTRODUCTION

The COVID-19 pandemic has swept across the world with astonishing speed. COVID-19 is a "novel, severe respiratory illness" for which "there is no known cure, no effective treatment, and no vaccine." *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (Roberts, J., concurring). COVID-19 is particularly difficult to control because it can be spread by asymptomatic carriers. Governors across the country have implemented safety measures to reduce transmission and protect the public health.

Illinois, like every state and country, has been forced to adapt to these unprecedented times. In response to the pandemic, many states and countries have imposed numerical limits on public gatherings because of the compelling governmental interest in slowing the virus's spread. Limiting gatherings has been necessary because "congregate functions," where people linger "close to one another for extended periods," "increase the chance that persons with COVID-19 may transmit the virus through the droplets that speech or song inevitably produce." *Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341, 346 (7th Cir. 2020). The Supreme Court, the Seventh Circuit, and this court have afforded deference to executive actions limiting public gatherings in keeping with long-standing precedent applicable to public health emergencies, *Jacobson v. Massachusetts*, 197 U.S. 11 (1905). *See South Bay*, 140 S. Ct. at 1613; *Elim*, 962 F.3d at 346-47; *Illinois Republican Party v. Pritzker*, No. 20-2175, 2020 WL 5246656, at *3 (7th Cir. Sept. 3, 2020); *Cassell v. Snyders*, No. 20 C 50153, 2020 WL 2112374, at *6-7 (N.D. Ill. May 3, 2020).

Like every other aspect of life, elections have been drastically affected by the pandemic. Traditional in-person voting on Election Day involves groups of people congregating "close to one another for extended periods," and therefore increases the risk of transmission of the virus. For this reason, public health experts such as the CDC recommend taking all available measures

to limit crowding in the polling place on Election Day.[1] At the same time, Illinois has already seen COVID-19 related problems in its elections. During the March primary, election authorities were forced to scramble as privately owned polling places refused to allow the election authorities to use their property, and election authorities were forced to designate alternate polling places at the last minute. Election authorities also faced difficulties with staffing these polling places. Many election judges in Illinois are older, which places them at higher risk of contracting COVID-19. Because of these increased risks, many election judges dropped out at the last minute, leading to a severe shortage of poll workers (and increased lines at the polls).

In response to these difficulties and public health guidance, the Illinois General Assembly took action in May to make some changes to the election process for the November election in light of the ongoing threat from COVID-19. Public Act 101-642 (P.A. 101-642 or the "May Amendments") amended various sections of the Illinois Election Code to make voting by mail easier for more voters, as well as to increase the number of locations available for polling places and increase the number of election judges.

Plaintiff, the Cook County Republican Party, takes issue with some of the provisions of P.A. 101-642. Plaintiff alleges that some of these provisions will lead to indirect disenfranchisement of Republican voters through vote dilution, or to direct disenfranchisement of Republican voters, in violation of Plaintiff's First Amendment rights. But the May Amendments were designed to increase voter participation and make it easier to vote; these

---

[1] *See Considerations for Election Polling Locations and Voters: Interim guidance to prevent spread of coronavirus disease 2019 (COVID-19)*, CENTERS FOR DISEASE CONTROL, *available at* https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html (last visited Aug. 29, 2020). This Court may take judicial notice of this information and other external sources cited in this brief, as they are public records "not subject to reasonable dispute." *Ennenga v. Starns*, 677 F.3d 766, 774 (7th Cir. 2012); *see* Fed. R. Evid. 201(b)(2) (permitting judicial notice of facts "whose accuracy cannot reasonably be questioned"); *see also* Fed. R. Evid. 902(6) (official documents and newspapers are self-authenticating); Fed. R. Evid. 101(b)(6) (rules on printed information apply to electronic sources of information).

temporary modifications to the Election Code do not burden anyone's rights. Thus, Plaintiff is not injured by any of these changes and lacks standing to bring this suit. Even if Plaintiff had standing, the General Assembly and Governor's actions taken in respond to the COVID-19 pandemic are entitled to deference under *Jacobson*. And even if the traditional *Anderson-Burdick* analysis were applied here, the May Amendments pass muster because, again, the amendments do not burden any voter's rights to vote. For all these reasons, Plaintiff's complaint should be dismissed in its entirety.

Plaintiff's motion for a preliminary injunction meets the same fate. Plaintiff has no likelihood of success on the merits, for the reasons discussed above. But the other preliminary injunction factors also weigh heavily against granting any relief. As discussed above, Plaintiff cannot show any injury from the May Amendments, and therefore cannot show irreparable harm either. On the other hand, the balance of harms weighs heavily against entry of a preliminary injunction. The purpose of the May Amendments was to increase access to absentee voting and reduce crowding at polling places so as to maximize citizens' ability to vote while reducing the risk of spreading COVID-19 at polling places. Plaintiff's baseless allegations of voter fraud does not compare favorably to the risk of further spread of COVID-19 and any subsequent loss of life that could result from making it more difficult for citizens to vote by mail rather than requiring them to stand in long lines at their regular polling places. Moreover, as the Fourth Circuit has observed: "By definition, '[t]he public interest . . . favors permitting as many qualified voters to vote as possible.'" *League of Women Voters of N. Carolina v. N. Carolina*, 769 F.3d 224, 247 (4th Cir. 2014), *quoting Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012). The State has a compelling interest in enabling as many qualified voters as possible to vote, without increasing their risk of contracting COVID-19.

Moreover, imposing any changes to voting procedures at this late date would impose significant burdens not just on the Defendants, but on the 108 election authorities across the State who are responsible for administering this election. And any last-minute changes to election procedures will cause voter confusion and could lead to actual disenfranchisement. Thus, the balance of harms weighs heavily against the issuance of any injunction, and Plaintiff's motion should be denied accordingly.

## BACKGROUND

**The Pandemic**

The COVID-19 pandemic continues to inflict a disastrous toll in Illinois and across the world. As of September 4, 8,143 people in Illinois have died from COVID-19, with 245,371 known positive cases.[2] Although the daily numbers of new COVID-19 cases and deaths in Illinois have generally decreased from the highest reported levels in April and May,[3] the crisis is far from over. Infection numbers continue to rise nationwide and across the world.[4] And despite the relative progress Illinois has achieved through its cautious approach, there is still no vaccine or effective treatment available for COVID-19.[5]

The dangers of COVID-19 are particularly serious with regard to traditional in-person voting. The CDC warns that elections "with only in-person voting on a single day are higher risk for COVID-19 spread because there will be larger crowds and longer wait times." *See* note 1

---

[2] *See COVID-19 Statistics*, ILL. DEP'T OF PUB. HEALTH, *available at* https://www.dph.illinois.gov/covid19/covid19-statistics (last accessed Sept. 4, 2020).

[3] *See* note 2 above (*see* graphs "Confirmed Cases Change All Time" and "Deaths Change All Time").

[4] *See WHO Coronavirus Disease (COVID-19) Dashboard*, WORLD HEALTH ORGANIZATION, *available at* https://covid19.who.int/?gclid=Cj0KCQjwy8f6BRC7ARIsAPIXOjh0bqPvZ22y_pY4R1OntrdCXU8IjgP xwnEsBZBI5WHu-c7xIGxdG_kaAkkZEALw_wcB (last visited Sept. 4, 2020) (reporting that, as of Sept. 4, 2020, there have been 26,171,112 confirmed cases of COVID-19 globally, including 865,154 deaths).

[5] Dr. Caitlin Rivers, *Coronavirus Is Not Done with Us Until We Have a Vaccine for COVID-19: Q&A*, USA TODAY (June 17, 2020), *available at* https://bit.ly/2UYc48b (last visited Sept. 4, 2020).

above. Accordingly, the CDC recommends that states offer "a wide variety of voting options," "maintain or increase the total number of polling places," provide "longer voting periods," and offer "any other feasible options for reducing the number of voters who congregate indoors in polling locations at the same time." *Id*.

Illinois has already seen COVID-19 related problems in its elections. During the March primary, election authorities were forced to scramble as privately-owned polling places refused to allow the election authorities to use their property, and election authorities were forced to designate alternate polling places at the last minute.[6] For example, the Chicago Election Board had 168 polling places drop out of the March primary. *Id*.

Election authorities also faced difficulties with staffing these polling places. Many election judges in Illinois are over 55,[7] which places many election judges at high risk of contracting COVID-19. Because of these increased risks, many election judges dropped out at the last minute (including "hundreds" of judges in Chicago alone), leading to a shortage of poll workers (and increased lines and delays at the polls). *Id*. The day before the March primary, election authorities were pleading for additional volunteers, and said that "due to extenuating circumstances, they [would] even deputize added judges on the spot if needed."[8]

---

[6] Craig Wall, *Chicago Election Board facing 'monumental obstacles'; governor says election will not be delayed*, ABC-7 EYEWITNESS NEWS (Mar. 15, 2020), *available at* https://abc7chicago.com/coronavirus-covid-19-chicago-voting-illinois-primay/6016278/ (last visited Aug. 31, 2020).

[7] According to the U.S. Election Assistance Commission, 58% of poll workers in the 2018 general election throughout the United States were over 60. *See* Barbara Sprunt, *Wanted: Young People To Work The Polls This November*, NPR, *available at* https://www.npr.org/2020/08/05/894331965/wanted-young-people-to-work-the-polls-this-november (last visited Aug. 31, 2020).

[8] *Illinois' Election to Proceed as Scheduled on Tuesday, Officials Say, Pleading for Volunteers*, NBC 5 CHICAGO (March 16, 2020), *available at* https://www.nbcchicago.com/news/local/chicago-politics/illinois-election-to-proceed-as-scheduled-on-tuesday-officials-say-pleading-for-volunteers/2238393/ (last visited Aug. 31, 2020).

**Voting by Mail in Illinois**

Over the last century, Illinois has gradually expanded the availability of voting by mail, traditionally referred to as "absentee" voting because it was originally reserved for voters who would be absent from the jurisdiction on Election Day. *McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802, 804 (1969). In 1917, the General Assembly made absentee voting available to those who would be absent from the county on business or other duties. *Id*. In 1944, absentee voting was made available to all those absent from the county for any reason. Provisions allowing voters who were present in the county but unable to appear at the polls because of physical incapacity, religious holidays, or election duties were added in 1955, 1961, and 1967, respectively. *Id*. In 2005, voters who were detained in jail pending trial were allowed to request absentee ballots (*see* P.A. 94-637), while in 2007 the General Assembly added child sex offenders who would be unable to enter their polling place (because the polling place was a prohibited location such as a school). P.A. 95-440.

Finally, in 2009 the General Assembly eliminated any requirement that the voter be absent or otherwise incapable of voting at the polls on Election Day. *See* P.A. 96-553. Thus, under the current rules, any registered Illinois voter may vote by mail without presenting an excuse or reason to do so. 10 ILCS 5/19-1; *see also* Dkt. 6 at 10.

**The May Amendments to the Election Code**

Given the pandemic and the General Assembly's ongoing commitment to encouraging voting, the General Assembly passed Public Act 101-642 on May 22, 2020. The May Amendments modify certain procedures for the administration of the November 2020 general election, and are only in effect until January 1, 2021. 10 ILCS 5/2B-5. The purpose of the May Amendments is "to protect the safety, health, and rights of the people of Illinois." 10 ILCS 5/2B-1. The May Amendments include the following provisions:

6

- Election Day has been an Illinois State Holiday since 1943 (*see* 10 ILCS 5/17-25), but previously only some State employees had the day off.[9] Section 2B-10 extends this holiday to all government employees, including county and municipal employees, public school employees, and public university employees. 10 ILCS 5/2B-10. All government offices must be closed unless used as a location for election day services or as a polling place, and all schools that are closed must be made available to use as a polling place for the November general election. *Id.*

- Section 2B-15(a) provides that any voter may request a mail-in ballot "by personal delivery, mail, email, or electronically on the website of the appropriate election authority." 10 ILCS 5/2B-15(a).

- Section 2B-15(b) required each election authority to mail or email a vote-by-mail ballot application to everyone who voted in the last three elections by August 1, 2020. 10 ILCS 5/2B-15(b).

- Section 2B-15(c) requires that the election authority also provide notices about how to return the ballot application, when the voter will receive a ballot, and instructions for completing and returning the ballot. 10 ILCS 5/2B-15(c). The election authority must also provide "a phone number or email address to contact the election authority" if the voter does not receive an official ballot or has questions, as well as "a website or phone number the elector can use to confirm receipt of his or her official ballot." *Id.*

- Section 2B-20(a) provides that election authorities may send out mail-in ballots beginning September 24, 2020. 10 ILCS 5/2B-20(a). If a voter submits a ballot application by October 1, 2020, the voter must receive a ballot by October 6, 2020. *Id.* If the voter requests a ballot application after October 1, 2020, the election authority must mail out the ballot within two business days of receipt of the application. *Id.*

- Section 2B-20(c) provides that three out of three election judges must agree that a signature on a certification envelope does not match the signature on file with the election authority in order to disqualify the ballot on that basis. 10 ILCS 5/2B-20(c). Section 2B-20(c) provides for five additional reasons for rejecting a ballot, each of which requires a majority vote of the election judges.[10] *Id.*

- Section 2B-20(d) requires that, if a vote-by-mail ballot is rejected, the election authority must notify the voter within two days, or within one day if the rejection occurs after Election Day. 10 ILCS 5/2B-20(d). If the ballot was rejected based on signature or lack of a signature, the voter may submit a statement the voter cast the ballot, and "upon

---

[9] *See Alternative Voting Methods: September 2008,* at 13-14, U.S. ELECTION ASSISTANCE COMM'N, *available at* https://www.eac.gov/sites/default/files/eac_assets/1/6/Alternative_Voting_Methods_Study.pdf (last visited Aug. 31, 2020).

[10] Plaintiff attached a non-final version of the Public Act 101-0642 to its brief in support of its preliminary injunction motion. *See* Dkt. 6-1. However, there are some discrepancies between Dkt. 6-1 and the final version of the May Amendments, including in 10 ILCS 5/2B-20. Defendant respectfully requests that the Court refer to Article 2B of the official Illinois Election Code, attached as Exhibit A and *available at* https://www.ilga.gov/legislation/ilcs/ilcs5.asp?ActID=170&ChapterID=3 (last visited Sept. 4, 2020).

receipt the ballot shall be determined valid and counted before the close of the period for counting provisional ballots." *Id*. If the ballot was rejected because the envelope was delivered opened, the voter may vote in person or request another vote-by-mail ballot. *Id*.

- Section 2B-20(e) provides that election authorities must accept any vote by mail ballot returned, including ballots returned with insufficient or no postage. 10 ILCS 5/2B-20(e). This section also allows election authorities to establish secure collection sites for the "postage-free return of vote by mail ballots," and election authorities must allow voters to return ballots to such collection sites up until the close of the polls on Election Day. *Id*.

- Section 2B-20(f) requires election authorities to transmit information about rejected ballots to the State Board of Elections (the "State Board"). 10 ILCS 5/2B-20(f). Election authorities also must provide the names and addresses of any vote by mail ballots received and any vote by mail ballots marked rejected to a state or local political committee upon request. *Id*.

- Section 2B-25 provides that a voter registering to vote or changing his or her address must be informed of the option to receive a vote-by-mail ballot, and that, upon request, the voter registration form will also serve as a ballot application. 10 ILCS 5/2B-25.

- Section 2B-30 requires election authorities and the Illinois Secretary of State to include statements encouraging early voting and voting by mail in all notices, flyers, etc., relating to the November election. 10 ILCS 5/2B-30. Section 2B-30 also requires the Secretary of State to send notices to all voters who received an application but have not requested a vote-by-mail ballot on September 15, 2020, and October 15, 2020. *Id.*

- Section 2B-35 requires election authorities to follow all safety and health guidelines established by the Illinois Department of Public Health. 10 ILCS 5/2B-35(a).  Section 2B-35 also allows election authorities to establish curbside voting (*id*. at (b)), and sets minimum requirements for early voting locations and hours. *Id*. at (c) and (d). Finally, Section 2B-35(e) allows a voter who casts a provisional ballot up to 14 days to provide the necessary documentation required to count the provisional ballot. *Id*. at (e).

- Section 2B-40 allows all individuals 16 years and over to serve as an election judge (10 ILCS 5/2B-40(a)), eliminating some of the restrictions that previously applied to election judges who were "juniors and seniors in high school." 10 ILCS 5/13-4(b). Section 2B-40 also requires schools to notify students and the Department of Employment Security to notify individuals receiving unemployment insurance of the opportunity to serve as an election judge. 10 ILCS 5/2B-40(b) and (c). Finally, Section 2B-40 allows counties with populations under 250,000 to appoint three election judges at a polling place rather than five, as is normally required. *Id*. at (d).

- Section 2B-45 allowed objectors to file an objection to a candidate's nominating petition by email, rather than in person. 10 ILCS 5/2B-45.

- Section 2B-50 required the election authorities to send the State Board a list of all voters sent ballot applications to the by August 2, 2020, as well as a list of voters who have requested ballot applications by September 2, 2020, and October 2, 2020. 10 ILCS 5/2B-

50(a). These lists are publicly available to "State and local political candidates and committees." *Id*. Finally, Section 2B-50 requires election authorities to notify the public of services and equipment available to assist elderly and disabled voters. *Id*. at (b).

- Section 2B-55 requires the State Board to post an official vote by mail application on its website and transmit and applications received to the appropriate election authority. 10 ILCS 5/2B-55(a). This section also requires the State Board to modify the online voter registration system to allow new registrants to apply for a vote-by-mail ballot while registering to vote. *Id*. at (b). Section 2B-55 also requires the State Board to transmit the lists sent by the election authorities pursuant to Section 2B-50 to the Secretary of State by September 5, 2020, and October 5, 2020, respectively. *Id*. at (d).

- Section 2B-60 allows the State Board to establish a program to reimburse election authorities for expenses related to the November election "incurred as a result of COVID-19" and the requirements of P.A. 101-642. 10 ILCS 5/2B-60. The State Board may withhold reimbursements for election related costs to election authorities that fail to comply with the provisions of P.A. 101-642.

**Plaintiff's Claims**

In Count I of its Complaint, Plaintiff alleges that certain provisions of the May Amendments violate the fundamental right to vote under the First Amendment by leading to "vote-dilution disenfranchisement." Dkt. 1 ¶ 75. Plaintiff also alleges that these same provisions violate the right to "the integrity of the election process" guaranteed in Article III, Section 4 of the Illinois Constitution. *Id*. Specifically, Plaintiff challenges Section 2B-20(e), which Plaintiff claims allows "ballot harvesting" (Dkt. 1 ¶¶ 43, 65); Section 2B-10, which extends the Election Day Holiday to all government workers (Dkt. 1 ¶ 66); Section 2B-20(c), which requires three out of three election judges to disqualify a vote-by-mail ballot based on a bad signature (Dkt. 1 ¶ 67); Section 2B-40, which Plaintiff claims allows for "underage election judges" (Dkt. 1 ¶ 68); and Section 2B-35, which allows for 14 days for voters to cure a provisional ballot. Dkt. 1 ¶ 69. Plaintiff alleges that these provisions "will lead to fraudulent votes being counted, thus diluting lawful votes for candidates of the Republican Party." *Id*. ¶¶ 65-70.

In Count II, Plaintiff alleges that certain provisions of the May Amendments violate the fundamental right to vote under the First Amendment and the right to "the integrity of the

9

election process" guaranteed in Article III, Section 4 of the Illinois Constitution by "direct disenfranchisement." Dkt. 1 ¶ 75. Specifically, Plaintiff challenges Section 2B-15(b), which required election authorities to send mail-in ballot applications by August 1, 2020 (Dkt. 1 ¶ 72); Section 2B-20(e), which Plaintiff claims allows "ballot harvesting" (Dkt. 1 ¶¶ 43, 73); and Section 2B-10, which extends the Election Day Holiday to all government workers (Dkt. 1 ¶ 66). Plaintiff also alleges that the May Amendments are deficient because they "fail[] to include a tracking system for ballots" and because they did not alter the existing deadline to request a ballot application set forth in 10 ILCS 5/19-2. Dkt. 1 ¶ 73. Plaintiff alleges that these provisions will "directly disenfranchis[e] voters for candidates of the Republican Party." *Id*. ¶¶ 73-74.

In Count III, Plaintiff alleges that certain provisions of the May Amendments violate the right to "secrecy of voting" guaranteed in Article III, Section 4 of the Illinois Constitution. In particular, Plaintiff challenges Section 2B-55(d), which allows political committees and candidates the right to request the names and addresses of voters who request a ballot by mail. Dkt. 1 ¶¶ 44, 78. Plaintiff also alleges that the "provision of SB 1863 expanding the number of mail-in ballots by millions will overrun the process of counting mail-in ballots, thus revealing secret ballots cast for and against candidates of the Republican Party." *Id*. ¶ 79.

Plaintiff has also moved for a preliminary injunction. Dkt. 5. Plaintiff requests that the Court enjoin each of the challenged provisions except for Section 2B-15(b), which Plaintiff apparently acknowledges is moot given that "millions of ballot applications were mailed just last week." Dkt. 6 at 15. Plaintiff also seeks to "enjoin Defendant Pritzker from declaring election day a paid holiday for government workers." *Id*.

10

**ARGUMENT**

**I.      Plaintiff's Complaint Should Be Dismissed.**

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) does not test

whether the plaintiff will prevail on the merits but instead whether the claimant has properly

stated a claim. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). "[O]nly a complaint that states

a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 679

(2009). In reviewing the sufficiency of a complaint under this standard, the court must accept as

true all well-pleaded factual allegations. *McCauley v. City of Chicago,* 671 F.3d 611, 616 (7th

Cir. 2011). However, legal conclusions and "conclusory allegations merely reciting the elements

of the claim are not entitled to this presumption of truth." *Id.*

A party may also move to dismiss a case or claim based on lack of subject matter

jurisdiction under Federal Rule of Civil Procedure 12(b)(1). When moving to dismiss under Rule

12(b)(1), where "the contention is that there is *in fact* no subject matter jurisdiction, the movant

may use affidavits and other material to support the motion. . . . And the court is free to weigh

the evidence to determine whether jurisdiction has been established." *Bannon v. Edgewater Med.*

*Ctr.*, 406 F. Supp. 2d 907, 920 (N.D. Ill. 2005) (emphasis in original); *see also Remer v.*

*Burlington Area Sch. Dist.*, 205 F.3d 990, 996 (7th Cir. 2000) (internal quotations omitted)

("[W]hen evidence pertinent to subject matter jurisdiction has been submitted, the court may

properly look beyond the jurisdictional allegations of the complaint to determine whether in fact

subject matter jurisdiction exists."). If the court "determines at any time that it lacks subject-

matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

**A.      Any request for relief regarding the mailing of ballot applications is moot.**

As an initial matter, Plaintiff's Complaint alleges that the provision of the May

Amendments "requiring 5 million mail-in ballot applications to be sent. . . will directly

disenfranchise many voters." Dkt. 1 ¶ 72. While it is unclear how or why this might

disenfranchise any voter, the issue is moot because these applications were already mailed to

voters on August 1, 2020 (prior to the Complaint being filed) (s*ee* 10 ILCS 5/2B-15(b)), as

Plaintiff acknowledges in its memorandum in support of its preliminary injunction. *See* Dkt. 6 at

16 ("Because millions of ballot applications were mailed just last week, Plaintiff requests that

this Court enjoin the remaining provisions of SB 1863 immediately."). A claim becomes moot

when "a court's decision can no longer affect the rights of litigants in the case before them and

simply would be 'an opinion advising what the law would be upon a hypothetical state of facts.'"

*H.P. by and through W.P. v. Naperville Comm. Unit Sch. Dist. #203*, 910 F.3d 957, 960 (7th Cir.

2018). Here, any claim relating to the mailing of ballot applications was moot before the

Complaint was even filed, and should be dismissed accordingly.

### B. Plaintiff lacks standing to bring this lawsuit.

It is well established that "Article III restricts the judicial power to actual 'Cases' and

'Controversies,' a limitation understood to confine the federal judiciary to the traditional role of

Anglo-American courts, which is to redress or prevent actual or imminently threatened injury."

*Ezell v. City of Chicago*, 641 F.3d 684, 694-95 (7th Cir. 2011). Accordingly, to assert standing

for injunctive relief, Plaintiff must show that it is "under an actual or imminent threat of

suffering a concrete and particularized 'injury in fact'"; that this injury is fairly traceable to the

defendant's conduct; and that it is likely that a favorable judicial decision will prevent or redress

the injury." *Common Cause Indiana v. Lawson*, 937 F.3d 944, 947 (7th Cir. 2019). Plaintiff bears

the burden of establishing these elements. *Id.* Importantly, the alleged threatened injury in fact

must be "actual and imminent, not conjectural or hypothetical." *Summers v. Earth Island*

*Institute*, 555 U.S. 488, 493 (2009). Moreover, a "generalized grievance against allegedly illegal

government conduct" is not sufficient for standing; only individuals who claim that they are

12

"personally denied" their rights may challenge an allegedly unconstitutional governmental action. *O'Sullivan v. City of Chicago*, 396 F.3d 843, 855 (7th Cir. 2005), *quoting United States v. Hays*, 515 U.S. 737, 743-44 (1995).

The requirements for standing ensure that there is a real need for courts to exercise judicial review to protect the interests of the complaining party. *Summers*, 555 U.S. at 493. "Where that need does not exist, allowing courts to oversee legislative or executive action would significantly alter the allocation of power . . . away from a democratic form of government." *Id.* (internal quotation marks omitted). Here, Plaintiff lacks standing to sue on its own behalf or on behalf of its members.

### 1. Plaintiff lacks standing to sue on its own behalf.

A political party may have standing to asset the rights of its members to challenge a law which would prevent or discourage those members from voting. *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007). However, the May Amendments to the Election Code do not prevent or discourage anyone from voting. Just the opposite, they make voting *easier* to vote and *encourages* voting.

Nonetheless, Plaintiff persists in alleging that the May Amendments will "disenfranchise" Republican voters despite expanding their options on how to vote. The gravamen of Plaintiff's claim is that the May Amendments' vote by mail provisions will somehow lead to a dilution of Republican votes. Generally, courts have not recognized organizational standing based on claims of vote dilution where those claims fail to show a nexus between the complained of activity and the claimed injury. *See, e.g.*, *Paher v. Cegavske*, No. 3:20-cv-243, 2020 WL 2748301, at *4 (D. Nev. May 27, 2020) ("Plaintiffs fail to show a nexus between the alleged violations and their claimed injury. . . . Here, Plaintiffs again fail to more than speculatively connect the specific conduct they challenge—that mail-in ballots are sent to

13

Nevada voters without request for an absentee ballot—and the claimed injury—direct voter disenfranchisement or disenfranchisement through vote dilution."); *Am. Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 789 (W.D. Tex. 2015) (finding Plaintiff lacked associational standing on vote dilution claim where the risk of vote dilution was speculative and "more akin to a generalized grievance about the government than an injury in fact").

Plaintiff does not supply any factual allegations demonstrating a nexus between the May Amendments and vote dilution or voter disenfranchisement. Instead, Plaintiff relies on a mixture of misleading descriptions of the May Amendments (while ignoring substantially similar provisions already in the Election Code), speculation based on isolated incidents from different States, and a baseless assertion that government workers will coordinate to commit voter fraud on a massive scale in favor of Democratic candidates. None of this is sufficient to show the May Amendments create an actual and imminent danger of voter disenfranchisement. Plaintiff's alleged threats of harm are merely conjectural and are not fairly traceable to the May Amendments. Thus, Plaintiff has not established an injury-in-fact and does not have standing to contest the amendments.[11]

    **a.    Illinois's deadline to request a mail-in ballot five days before the election is not part of the challenged amendments and does not injure Plaintiff.**

Plaintiff first alleges that Illinois's deadline to request a mail-in ballot within five days before the election (framed by Plaintiff as "three business days") is somehow unconstitutional. Dkt. 1 ¶¶ 33, 72. But this provision was already part of the Election Code prior to the May

---

[11] As an initial matter, Plaintiff also takes issue with the approximately 5 million vote-by-mail applications (Dkt. 1 ¶ 72), which were already mailed to voters on August 1, 2020 (prior to the Complaint being filed). *See* 10 ILCS 5/2B-15(b).  As discussed above, any claim for injunctive relief on that basis is moot. Moreover, Plaintiff never explains how the simple act of mailing vote-by-mail applications leads to voter disenfranchisement or otherwise causes injury.

Amendments. *See* 10 ILCS 5/19-2 ("Section 19-2"). Thus, it is not part of any of the May Amendments challenged in this lawsuit.

In any event, Section 19-2 does not disenfranchise voters. A request for a mail-in ballot five days before an election would require a somewhat tight turnaround for the election authority to send the ballot to the voter. But no voter is obligated to wait until the deadline to request a ballot; instead, voters can request a ballot as early as 90 days before the election. *Id.* And election authorities are not mandated to wait until the week before the election to begin mailing out mail-in ballots. Indeed, pursuant to Section 2B-20, election authorities may start mailing out ballots as early as September 24, 2020. 10 ILCS 5/2B-20(a). Further, any person who requests a mail-in ballot before October 1, 2020 must receive their ballot no later than October 6, 2020. *Id.* Moreover, the Section 19-2 deadline does not affect any voter who requests a mail-in ballot more than a week in advance of the election, as recommended by the United States Postal Service ("USPS").

Voters who wait until the deadline to request a mail-in ballot are plainly not injured because they are utilizing an option to vote which would not otherwise be available to them if the deadline were earlier. This later deadline thus increases and encourages voter participation, rather than preventing or discouraging it. Even if a voter does not receive their ballot until Election Day, their ballot would still count as long as the ballot is postmarked no later than Election Day and is received by the Election Authority before the time to stop counting provisional ballots is over. 10 ILCS 5/19-8(c). For this election, this gives the post office 14 days to return ballots postmarked on Election Day to the election authority for that ballot to count. 10 ILCS 5/2B-35(e).

Voters also have the option of bypassing the post office entirely and personally delivering their ballots to ballot drop boxes at designated locations. *See* 10 ILCS 5/2B-20(e). Finally, even

if a mail-in ballot does not reach a voter who applied for one by Election Day,[12] that voter still has the ability to vote in person, as nothing in Illinois law prevents a person who applied for a mail-in ballot from ultimately voting in person so long as they have not already cast their ballot through the mail. Accordingly, the five-day deadline for which to apply for a mail-in ballot does not create an injury-in-fact for any voter, and Plaintiff does not have standing to challenge it.

> **b.      The Election Code does not injure voters by not requiring that mail-in ballots be tracked.**

Plaintiff alleges that the May Amendments' lack of a provision requiring that mail-in ballots be tracked will disenfranchise voters. Dkt. 1 at ¶ 36. *First*, this is not a challenge to any specific provision of the May Amendments (or the broader Election Code for that matter). Accordingly, it is essentially a challenge to the Election Code's entire mail-in voting scheme. Plaintiff is alleging that the lack of a provision in a statute that Plaintiff would find desirable causes it injury. This is a novel theory to establish standing for which Plaintiff provides no authority. Moreover, it is not redressable because the Court cannot command the General Assembly to pass a new law or write a new provision into a statute. *See Perhats Assocs., Inc. v. Fasco Indus., Inc.*, 843 F. Supp. 424, 426 (N.D. Ill. 1994) ("[F]ederal judges do not sit as superlegislators to amend or repeal the work of Congress.").

*Second*, the Election Code permits election authorities to use barcode tracking if they so choose. *See* 10 ILCS 5/19-8(c). Many election authorities, including both the Cook County

---

[12] To the extent that Plaintiff has made allegations regarding the slow delivery of mail due to changes by the current Post Master General, this issue is not redressable through this lawsuit, as the State of Illinois has no control over how USPS functions or its timely delivery of mail.

16

Clerk[13] and the Chicago Board of Elections,[14] already track ballots through USPS. Thus, the very thing Plaintiff desires is already utilized by the only election authorities that affect the Plaintiff. Plaintiff only operates in Cook County and thus cannot be injured by the lack of a tracking system in other counties in Illinois.

*Third*, any concern that USPS may lose mail is not redressable through this lawsuit because the State of Illinois does not control USPS. Regardless, the May Amendments require each election authority provide voters with "a phone number or email address to contact the election authority if the elector does not receive an official ballot or if the elector has questions," as well as "a website or phone number the elector can use to confirm receipt of his or her official ballot." 10 ILCS 2B-15(c). Thus, all voters in the State have a free means of confirming that the election authority received their ballot. Accordingly, the lack of an explicit requirement for all election authorities to use USPS tracking for mail-in ballots does not cause any voters to be injured.

### c. The May Amendments do not change the rules regarding "ballot harvesting" and do not injure Plaintiff.

Plaintiff also alleges that the May Amendments now allow so-called "ballot harvesting." As defined by Plaintiff, this is where a political operative collects ballots for voters to return them for the voter. Dkt. 1 at ¶ 39. Plaintiff alleges that partisan operatives will then return

---

[13] *See Mail Ballot Application*, COOK COUNTY CLERK'S OFFICE, *available at* https://mailvoting.cookcountyclerkil.gov/ (last visited Aug. 28, 2020) ("A voter may confirm receipt of their official ballot by the Cook County Clerk by using the 'What Is My Mail Ballot Status' option of the Voter Information Tool or call 312.603.0946.")

[14] *Vote by Mail*, CHICAGO BOARD OF ELECTION COMMISSIONERS, *available at* https://chicagoelections.gov/en/vote-by-mail.html (last visited Aug. 28, 2020) (stating that Chicago voters who apply online to vote by mail will receive an email to confirm that their application has been received, and email when the ballot is mailed "with a unique link to a system to track the ballot through the US Postal Service," as well as emails when their "Ballot Return Envelope" is received by the Election Board and when it has been approved for counting).

Democratic-voting mail-in ballots and throw Republican-voting ballots in the trash. As an initial matter, Plaintiff never explains how the operative would know which sealed envelopes contain Democratic votes and which sealed envelopes contain Republican votes. Moreover, Plaintiff's allegation that a partisan operative in Illinois would engage in this fraudulent behavior is purely speculative and would not be fairly traceable to the May Amendments. The Election Code does not authorize such fraudulent behavior. Thus, this is not an actual injury-in-fact which is fairly traceable to the Election Code.

In any event, Section 2B-20(e) does not change Election Code's requirements regarding who may deliver a mail-in ballot. As Plaintiff recognizes in its Motion for Preliminary Injunction, the Election Code already permits voters to authorize another person to return their mail-in ballot. 10 ILCS 5/19-6. If the voter does authorize another person to deliver their ballot, both the voter and the person delivering the ballot must execute an authorization form on the exterior of the envelope supplied by the election authority. *Id*.

Section 2B-20(e) does not change this. All it establishes is that, if a returned ballot lacks sufficient postage, the ballot must still be accepted. 10 ILCS 5/2B-20(e). It also provides for election authorities to "establish secure collection sites for the postage-free return of vote by mail ballots." *Id*. The provision says nothing about who may return the ballot to a mailbox or drop box. Because the May Amendments do not change the rules with regard to so-called "ballot harvesting," an injunction against their enforcement would not redress any alleged injury caused by "ballot harvesting."[15]

---

[15] Indeed, if the Court were to enjoin 10 ILCS 5/19-6, such an injunction would conflict with 52 U.S.C. § 10508, which provides that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice." As the Fifth Circuit has held, voting includes all "steps in the voting process *before entering* the ballot box, "registration," and it includes steps in the voting process *after leaving* the ballot box, [including] 'having such ballot counted properly.'" *OCA-Greater Houston v. Texas*, 867 F.3d 604, 615 (5th Cir. 2017) (emphasis in original). Thus, any limitation on who can return an absentee ballot might violate 52 U.S.C.

18

> **d. The requirement that three election judges concur on an invalid signature lessens the likelihood that valid ballots are discarded.**

Plaintiff alleges that the May Amendments' requirement that three out of three election judges agree that a signature on a certification envelope does not match the signature on file with the election authority (10 ILCS 5/2B-20(c)) will somehow lead to Republican votes being disenfranchised. Plaintiff's theory is that partisan democratic election judges will effectively veto the disqualification of any Democratic voting ballots, thus allowing fraudulent Democratic ballots through and diluting the votes for Republican candidates.

But the procedures already provided for in the Election Code would prevent this from happening. Section 19-8 of the Election Code provides for all evaluations of the signatures on a mail-in ballot to occur before opening the ballot. *See* 10 ILCS 5/19-8(g) (providing that when a mail-in ballot is rejected, the ballot is marked 'Rejected" across the face of the certification envelope "without opening the certification envelope"). Nothing in the May Amendments changes the procedure of evaluating the signatures without opening the ballot. Accordingly, the speculative scheme put forth by Plaintiff would be impossible under the rules and is thus pure conjecture. It is not an actionable injury in fact.[16] Moreover, this procedure prevents overzealous election judges from unilaterally disqualifying valid ballots and forcing voters to take additional steps to ensure their votes are counted. *See id.* (providing that a single election judge may

---

§ 10508, as well as the ADA. *See Democracy N. Carolina v. N. Carolina State Bd. of Elections*, No. 1:20CV457, 2020 WL 4484063, at *57-61 (M.D.N.C. Aug. 4, 2020) (finding that "voting" includes the delivery of an absentee ballot to a county board of elections and holding that North Carolina's restrictions on who could collect and deliver an absentee ballot violated 52 U.S.C. § 10508 and the ADA); *Priorities USA v. Nessel*, No. 19-13341, 2020 WL 2615766, at *14 (E.D. Mich. May 22, 2020) (finding that plaintiffs had stated a claim that Michigan's restrictions on who can return an absentee ballot were preempted by 52 U.S.C § 10508).

[16] Additionally, the matching signature issue is the only basis for rejection of a mail-in ballot that requires a unanimous vote. Section 2B-20 provides for five additional reasons for rejecting a ballot, which requires a majority vote of the election judges, not unanimity. 10 ILCS 5/2B-20(c).

disqualify a ballot based on a non-matching signature); 10 ILCS 5/19-8(g-5) (providing the process for which voters may challenge why their ballots were rejected).

> **e.  The May Amendments' expansion of allowing all 16 year-olds and older to be election judges does not create an injury.**

Plaintiff alleges that the May Amendments' provision allowing election judges to have a minimum age of sixteen years, 10 ILCS 5/2B-40(a)(1) somehow will lead to voter disenfranchisement. But Plaintiff never alleges any facts which lead to this conclusion. Instead, Plaintiff merely asserts, without providing any supporting facts, that people who are old enough to be trusted to drive, *see* 625 ILCS 5/6-107(b), cannot be trusted to compare signatures, ensure ballot envelopes are delivered closed, ensure the voter has not already cast a ballot, and ensure the voter is registered within that precinct. *See* 10 ILCS 5/2B-20(c). Indeed, the Election Code already permits juniors and seniors in high school to serve as election judges as long as the student met certain requirements (*see* 10 ILCS 5/13-4(b)); Section 2B-40(a)(1) merely eases the restrictions on 16- and 17-year-old election judges.[17] Because Plaintiff fails to provide any factual allegations as to how a person being 16 years old means that they will not be able to fulfill their duties as election judges, Plaintiff has failed to allege any injury-in-fact in regards to this provision, and therefore lacks standing to challenge it.

> **f.  The May Amendments' provision allowing for the disclosure of vote-by-mail lists does not harm anyone.**

Plaintiff also takes issue with the May Amendments' provision allowing for State and local political candidates and committees to request and obtain lists of voters who have requested

---

[17] Forty-five states and the District of Columbia allow minors to be poll workers, with 33 states and the District of Columbia allowing 16-year-olds to serve. *See Election Poll Workers*, NATIONAL CONFERENCE OF STATE LEGISLATURES, *available at* https://www.ncsl.org/research/elections-and-campaigns/election-poll-workers637018267.aspx (last visited Aug. 29, 2020) ("Youth poll workers can be excellent additions to precinct polling places as they can readily learn how to use electronic poll books, assist elderly and disabled voters and, in many states, do the same jobs as adult poll workers.").

mail-in ballots. But Plaintiff never explains what harm this may cause to voters. Plaintiff implies that this may somehow violate Article III, Section 4 of the Illinois Constitution, which instructs the Illinois General Assembly to provide for secrecy in voting. But completed ballot applications have been available "for public inspection on request" since 1989. *See* P.A. 86-873; *see also* 10 ILCS 5/19-4. Thus, providing members of the public with a list rather than requiring them to come to the election authority's offices is merely a tweak that promotes social distancing and protects both election authority employees and the public, rather than a new injury to Plaintiff.

As discussed below, this claim is barred by the Eleventh Amendment. Moreover, the provisions of the Election Code relating to secrecy consistently and only relate to maintaining the secrecy of the markings of a voter's ballot. *See*, *e.g.*, 10 ILCS 5/19-5; 10 ILCS 5/19A-40; 10 ILCS 5/17-12. The May Amendments do nothing to jeopardize the secrecy of the markings on a ballot and thus do not cause any injury based on any Illinois secrecy in voting law.[18]

> **g.** **The May Amendments' expansion of the Election Day Holiday to all state workers and extension of the provisional ballot deadline do not create an injury.**

Finally, Plaintiff's final source of alleged injury combines two unrelated provisions in the May Amendments. The first is the May Amendments' expansion of Illinois's Election Day holiday (*see* 10 ILCS 5/17-25) to give all government employees the day off.[19] 10 ILCS 5/2B-10. The second is the extension of the deadline to cure a provisional ballot from seven days after the

---

[18] Plaintiff also alleges that "the provision of SB 1863 expanding the number of mail-in ballots by millions will overrun the process of counting mail-in ballots, thus revealing secret ballots cast for and against candidates of the Republican Party." Dkt. 1 ¶ 79. It is unclear which provision(s) of the May Amendments Plaintiff is challenging, and as discussed below, all of Plaintiff's claims under the Illinois Constitution are barred by the Eleventh Amendment. In any case, it is unclear why Plaintiff believes that an increase in vote-by-mail ballots will result in the secrecy of those ballots being violated, and thus there is no injury alleged here, either. And any alleged injury is caused by COVID-19 and voters' need to avoid in-person voting based on public health guidelines, and is therefore not redressable through this suit.

[19] Election Day has been an Illinois State Holiday since 1943. Prior to the May Amendments, many, but not all, state employees had the day off for Election Day. *See* note 9 above.

election to fourteen days after the election. 10 ILCS 5/2B-35(e). Facially, these provisions do not impact Plaintiff at all, let alone cause an injury-in-fact. So Plaintiff hypothesizes an outrageous scenario in order to create one.

First, Plaintiff cites an unrelated article from the Washington Post regarding postal workers taking time off in the days and weeks leading up to an election to campaign. Dkt. 1 ¶ 51. Plaintiff uses this article to assert that a state holiday means that hordes of State employees will harvest ballots, even though they have zero evidence this would occur. *Id*. ¶ 50.

But Plaintiff does not stop there. Plaintiff also alleges that state workers will figure out which voters have not requested mail-in ballots and then impersonate those people to cast a provisional vote in person. *Id*. ¶ 59. And then Plaintiff alleges that because those impersonated votes will need to be provisional that those state employees *will track down the people they impersonated and somehow convince them to present identification to the Secretary of State to certify the provisional ballot that was fraudulently cast in their name*. *Id.*

There is no evidence whatsoever that this absurd scenario it at all likely, let alone *actual* and *imminent*. These allegations go beyond speculation to conspiracy theory. Plaintiff cannot create an injury-in-fact where none exists by asserting a baseless conspiracy theory and expect the Court to credit it as true. The expansion of an already-existing state holiday to all state employees and the extension of the time to cure a provisional ballot are both laws which do not interfere with Plaintiff's legal rights. Plaintiff has no standing to challenge them.

### 2. Plaintiff lacks standing to sue on behalf of its members.

Nor does Plaintiff have standing to sue on behalf of its members. An organization may have standing to sue on its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual

members in the lawsuit. *Hunt v. Washington State Apple Advertising Com'n*, 432 U.S. 333, 343 (1977). Here, Plaintiff cannot satisfy the first element. As discussed above, none of the provisions of the May amendments will cause an injury-in-fact to any of Plaintiff's members, thus Plaintiff's members do not have standing to sue in their own right. Moreover, to establish standing Plaintiff would need to demonstrate through specific facts that one or more of its members would be directly affected by the challenged provisions of the Election Code. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 563 (1992). Plaintiff does not attempt to plead how any of its specific members would be disenfranchised. Thus, Plaintiff does not have standing to sue on behalf of its members.

### C. The May Amendments are valid under *Jacobson*'s deferential standard for public health emergencies.

Although Plaintiff does not discuss it, the proper framework for evaluating governmental action in a health crisis derives from *Jacobson v. Massachusetts*, 197 U.S. 11 (1905). Under *Jacobson* and its progeny, it is well-established that "the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand." *Jacobson*, 197 U.S. at 29. COVID-19 certainly qualifies as the type of public health crisis contemplated by *Jacobson*; as such, in this instance, the actions taken by the General Assembly and the Governor to enable voting while preventing the transmission of COVID-19 should be upheld so long as there is a "real and substantial relation" to public health and safety, and the action does not constitute "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Jacobson*, 197 U.S. at 31. Unless the executive exercises its authority in "an arbitrary, unreasonable manner" or "go[es] so far beyond what was reasonably required for the safety of the public," courts will not "usurp the functions of another branch of government." *Id.* at 28. *See*

23

*also South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (Roberts, J., concurring) (under *Jacobson*, when "officials 'undertake[ ] to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad'"); *Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341, 346 (7th Cir. 2020) (stating "[w]e line up with Chief Justice Roberts" in his concurrence from *South Bay* and citing *Jacobson*); *Illinois Republican Party v. Pritzker*, No. 20-2175, 2020 WL 5246656, at *3 (7th Cir. Sept. 3, 2020) ("At least at this stage of the pandemic, *Jacobson* takes off the table any general challenge to [the executive order] based on the Fourteenth Amendment's protection of liberty. Like the order designed to combat the smallpox epidemic, [the executive order] is an order designed to address a serious public-health crisis.")

Unquestionably, *Jacobson* only applies in extraordinary circumstances. *Jacobson*, 197 U.S. at 39. Courts have thus not had the opportunity to explore the contours of how *Jacobson* applies across a swath of different scenarios. However, the ongoing pandemic is undeniably one of the extraordinary circumstances contemplated by *Jacobson*, and the Supreme Court *has* provided clear guidance as to how *Jacobson* should be applied as it relates to COVID-19. *See South Bay*, 140 S. Ct. at 1613 (Roberts, C.J., concurring). In his concurrence in *South Bay*, where the Court denied a request for injunctive relief related to religious gatherings, Chief Justice Roberts illustrated the ultimate significance of *Jacobson*, which is to recognize that during a public health crisis it is imperative that State officials have wide latitude to take action designed to protect the public health. *Id.* at *1. The Chief Justice explained that State officials "should not be subject to second-guessing by an 'unelected federal judiciary,' which lacks the background, competence, and expertise to assess public health and is not accountable to the people." *Id.*

To combat a virulently infectious disease in an emergency pandemic, the State must be able to take swift and decisive action. *Cf. United States v. Chalk*, 441 F.2d 1277, 1281 (4th Cir.

1971). The court's review of temporary measures during such an emergency is therefore "limited to a determination of whether the [State's] actions were taken in good faith and whether there is some factual basis for [the State's] decision that the restrictions [it] imposed were necessary to maintain order." *Id.*; *see also Jacobson*, 197 U.S. at 29 ("reasonable regulations" may be implemented in the face of an infectious disease epidemic). This deferential standard recognizes that, in a public health crisis, "it is no part of the function of a court . . . to determine which one of two modes was likely to be the most effective for the protection of the public against disease," *Jacobson*, 197 U.S. at 30, and that "governing authorities must be granted the proper deference and wide latitude necessary for dealing with . . . emergenc[ies]." *Smith v. Avino*, 91 F.3d 105, 109 (11th Cir. 1996), *abrogated on other grounds by Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998).

Here, putting aside Plaintiff's baseless accusations, there is no question that the May Amendments were passed by the General Assembly and signed by the Governor in good faith and based on the recommendations of public health authorities. *See* 10 ILCS 5/2B-1 (purpose of the May Amendments is "to protect the safety, health, and rights of the people of Illinois" during the "COVID-19 public health emergency"). As discussed above, the CDC recommends that states pursue all "feasible options for reducing the number of voters who congregate indoors in polling locations at the same time." *See* note 1 above. The May Amendments are the General Assembly and the Governor's good-faith efforts to follow that guidance.

As discussed above, the May Amendments were designed to encourage voters to vote by mail, increase the availability of public buildings as polling places, and increase the availability of election judges. The overall effect of the May Amendments, then, was to maximize voter turnout while decreasing crowding in polling places on Election Day. This is manifestly a measure with a "real or substantial relation" to public health and safety. And not only is the

25

measure not "a plain, palpable invasion of rights secured by the fundamental law," as discussed above, it does not negatively affect anyone's rights at all. Thus, the General Assembly and the Governor are entitled to deference in their enactment of the May Amendments, and the Court may dismiss Plaintiff's complaint for this reason alone.

### D. The May Amendments are valid under *Anderson-Burdick* analysis.

Even if the Court were to apply the *Anderson-Burdick* framework rather than *Jacobson*, the May Amendments are a valid exercise of the General Assembly's and Governor's authority. The Constitution "confers on the states broad authority to regulate the conduct of elections, including federal ones." *Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004); *see also Shelby County, Ala. v. Holder*, 133 S. Ct. 2612, 2623 (2013) ("States have broad powers to determine the conditions under which the right of suffrage may be exercised.") (citation and internal quotation marks omitted)). Accordingly, regulations of the electoral process are subject to a "flexible standard," *Libertarian Party of Illinois v. Rednour*, 108 F.3d 768, 773 (7th Cir. 1997), that has come to be known as the *Anderson-Burdick* standard, after the two Supreme Court cases in which it was developed. *See Burdick v. Takushi*, 504 U.S. 428 (1992), and *Anderson v. Celebrezze*, 460 U.S. 789 (1983); *see also Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 190, 202-03 (2008) (opinion of Stevens, J.) (applying *Anderson-Burdick* standard to regulation of voting procedures); *id*. at 204-05 (Scalia, J., concurring in the judgment) (same).

Under this standard, the reviewing court must weigh the "'character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments…' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule.'" *Burdick*, 504 U.S. at 434, *quoting Anderson*, 460 U.S. 789 (1983). If an electoral regulation imposes a "severe" restriction on First or Fourteenth Amendment rights, strict scrutiny applies. *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997). If, on the other hand, the

26

State has imposed "reasonable, nondiscriminatory restrictions on these rights… the [S]tate's important regulatory interests will generally be sufficient to justify the regulations." *Libertarian Party*, 108 F.3d at 773, *citing Burdick*, 504 U.S. at 434; *see also Timmons*, 520 U.S. at 358.

**1. The May Amendments enhance rather than burden the right to vote.**

Here, the May Amendments do not deny, infringe, or inhibit anyone's right to vote. On the contrary, the amendments enhance the right to vote by making it easier for voters to request and return mail-in ballots. In that regard, the May Amendments represent the latest in an incremental series of expansions of opportunities to vote by mail, as discussed in the Background section above. The amendments do not preference any voters or burden any voter's rights.

Heightened constitutional scrutiny does not apply to legislation that enhances voting rights as opposed to burdening them. That is the message of decisions by the Supreme Court and the Seventh Circuit rejecting efforts by litigants to use the Constitution to expand the availability of absentee ballots beyond what the Illinois General Assembly had already provided. For example, in *McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802 (1969), pretrial detainees in Cook County Jail asserted that the Equal Protection Clause obligated Illinois to make absentee ballots available to them because it had already made such ballots available to, *inter alia*, people who were physically incapacitated for medical reasons. A unanimous Court concluded that heightened scrutiny was inappropriate for two reasons: first, Illinois's absentee provisions did not classify voters by wealth or race, and second, the record did not indicate any impact on the detainees' "ability to exercise the fundamental right to vote," because the State could allow them to vote in person, perhaps by setting up special polling booths in the jail or providing guarded transportation to the polls. *Id*. at 807, 808 n.6.

Instead, *McDonald* subjected the challenged absentee provisions to rational basis scrutiny. *Id*. at 809. In particular, the Court noted that "a legislature traditionally has been

allowed to take reform 'one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.'" *Id.*, *quoting Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 489 (1955)). To that end, the Court commented that it was "ironic[]" that "Illinois' willingness to go further than many States in extending the absentee voting privileges" had exposed it to a constitutional challenge seeking to force it to go further still. *Id.* at 810-11. In the end, the Court observed, the record disclosed "not an arbitrary scheme or plan but, rather, the very opposite—a consistent and laudable state policy of adding, over a 50-year period, groups to the absentee coverage." *Id.* at 811.

To be sure, *McDonald* predated the Supreme Court's development of the *Anderson-Burdick* standard. But none of the Supreme Court's or the Seventh Circuit's cases applying *Anderson-Burdick* has ever called *McDonald* into question, and for good reason: those cases deal with voting "restrictions," *Anderson*, 460 U.S. at 789, or "burdens," *Burdick*, 504 U.S. at 434, while *McDonald* continues to stand for the proposition that laws that do not restrict or burden the right to vote are not subject to heightened judicial scrutiny. The Seventh Circuit's more recent decision in *Griffin* reinforces the point. In *Griffin*, the plaintiffs were working mothers who alleged they were unable to get to the polling place on election day. 385 F.3d at 1130. As in *McDonald*, the plaintiffs argued that the Constitution required Illinois to extend to them the same absentee voting rights it had extended to others. The Seventh Circuit, without citing *Anderson* or *Burdick*, had little difficulty rejecting their challenge. How far to extend absentee voting, it held, was "quintessentially a legislative judgment with which we judges should not interfere unless strongly convinced that the legislative judgment is grossly awry." *Id.* at 1131.

*McDonald* and *Griffin* are dispositive here. As described above, the May Amendments are the latest in a series of laws incrementally expanding the availability of absentee voting and making it easier to request and return absentee ballots. The amendments do not burden or restrict

28

anyone's ability to vote, and should not be subjected to heightened scrutiny. And the May Amendments easily pass rational basis, as they are rationally related to the State's compelling interest in allowing as many voters as possible to vote without increasing the risk of COVID-19 transmission through in-person voting on Election Day.

### 2. Plaintiff cannot state a claim for vote-dilution disenfranchisement.

Moreover, Count I fails because Plaintiff cannot state a claim for disenfranchisement through vote dilution. Vote dilution may be a viable voting claim in certain contexts, such as when laws structurally devalue one group's votes over another's. *See, e.g., Reynolds v. Sims*, 377 U.S. 533, 563–64 (1964). But the "Constitution is not an election fraud statute." *Bodine v. Elkhart Cty. Election Bd*., 788 F.2d 1270, 1271 (7th Cir. 1986)). Plaintiff cannot use the vote-dilution line of cases to make it more difficult for their fellow citizens to vote, based entirely on unfounded and speculative fears of voter fraud. *Cf. Short v. Brown*, 893 F.3d 671, 677–78 (9th Cir. 2018) ("Nor have the appellants cited any authority explaining how a law that makes it easier to vote would violate the Constitution."). To the contrary, courts have routinely rejected such efforts. *See Minn. Voters Alliance v. Ritchie*, 720 F.3d 1029, 1031–32 (8th Cir. 2013); *Bodine*, 788 F.2d at 1272; *Pettengill v. Putnam Cty. R-1 Sch. Dist., Unionville, Mo*., 472 F.2d 121, 122 (8th Cir. 1973) (the federal court is not "the arbiter of disputes over whether particular persons were or were not entitled to vote or over alleged irregularities in the transmission and handling of absentee voter ballots"); *Paher*, 2020 WL 2748301, at \*6-7; *Republican Party of Pa. v. Cortés*, 218 F. Supp. 3d 396, 406–07 (E.D. Pa. 2016).

The cases that Plaintiff relies on do not support its claim. *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam), *Crawford v. Marion County Election Board*, 472 F.3d 949, 952 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008), and *Ohio Republican Party v. Brunner*, 544 F.3d 711, 713 (6th Cir. 2008), *vacated*, 555 U.S. 5 (2008), all find that the state has a cognizable interest in

preventing voter fraud and may take reasonable measures to prevent such fraud.[20] But none of these cases suggest that private parties may prevent a state from implementing measures making it easier for citizens to vote. On the contrary, as the Seventh Circuit has held, "the striking of the balance between discouraging fraud and other abuses and encouraging turnout is quintessentially a legislative judgment with which we judges should not interfere unless strongly convinced that the legislative judgment is grossly awry." *Griffin*, 385 F.3d at 1131. *See also Republican Nat. Comm. v. Common Cause RI*, No. 20A28, 2020 WL 4680151, at *1 (U.S. Aug. 13, 2020) (holding that third-party intervenor lacked "a cognizable interest in the State's ability to 'enforce its duly enacted' laws" related to preventing voter fraud where the state itself did not oppose consent decree modifying absentee ballot procedures in light of COVID-19 pandemic). As discussed above, the May Amendments enact reasonable measures designed to encourage voting in a safe manner. Accordingly, there is no basis for the Court to interfere here.

In determining whether a law is facially invalid, courts "must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 454 (2008). The Supreme Court has made clear that perceived threats to constitutional rights based on speculative contentions unsupported by record evidence cannot satisfy the "heavy burden of persuasion" required to prevail on a facial challenge. *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 200 (2008); *see also Wash. State Grange*, 552 U.S. at 454 (rejecting facial challenge to constitutionality of state election law because plaintiffs' theory depended not on the law's facial requirements but on sheer speculation that the law would cause voter confusion and there was no evidentiary record

---

[20] *United States v. Saylor*, 322 U.S. 385, 389 (1944), merely permits the criminalization of voter fraud, which is not at issue in this case. *See also Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) (citing *Saylor*); *Baker v. Carr*, 369 U.S. 186, 208 (1962) (same).

against which to assess their assertions that voters would in fact be confused). Here, as discussed above, Plaintiff has presented nothing but "hypothetical" and "imaginary" cases to support its vote-dilution claim. The Court should not accept the Plaintiff's invitation to strike down a reasonable public health measure based on nothing more than baseless speculation.

### 3. Plaintiff cannot state a claim for direct disenfranchisement.

For the same reasons, Plaintiff cannot state a claim for direct disenfranchisement of any voter. As discussed in detail above, the May Amendments are designed to encourage voting and make it easier to vote. They do not burden any voter's right to vote, much less disenfranchise any voter. Plaintiff's facial challenge is based entirely on speculative, hypothetical scenarios based on the incompetence of third parties such as the USPS or on a massive conspiracy involving a horde of government employees. Plaintiff lacks even a shred of support for its claims and they should be dismissed accordingly.

### E. Plaintiff's claims under the Illinois Constitution are barred under the Eleventh Amendment.

Finally, Plaintiff's claims under the Illinois Constitution in Counts I–III are barred by the Eleventh Amendment. Although the Eleventh Amendment does not bar claims for injunctive relief against state officials to stop an ongoing violation of *federal* law, *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002), this exception does not extend to allowing claims based on alleged violations of state law. *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) ("A federal court's grant of relief against state officials on the basis of state law … does not vindicate the supreme authority of federal law."). In holding that the Eleventh Amendment bars suits against state officials to compel them to conform their conduct to state law, the *Pennhurst* Court noted that "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to

31

state law." *Id.* at 106. The Eleventh Amendment similarly bars state-law claims for declaratory relief. *Watkins v. Blinzinger*, 789 F.2d 474, 483–84 (7th Cir. 1986); *Benning v. Bd. of Regents*, 928 F.2d 775, 778 (7th Cir. 1991). A declaratory judgment cannot be used to avoid the Eleventh Amendment when monetary and injunctive relief would be barred. *Council 31 of AFSCME. v. Quinn*, 680 F.3d 875, 884 (7th Cir. 2012).

Accordingly, Plaintiff's claims under the Illinois Constitution are barred in federal court. It is irrelevant that Plaintiff's other arguments allege violations of federal law. The limits on federal jurisdiction over state-law claims cannot be evaded by making those claims pendent to federal claims. *Pennhurst*, 465 U.S. at 119–21. Applying this logic, the federal courts have routinely dismissed claims based on the Illinois Constitution. *See, e.g.*, *Travis v. Illinois Dep't of Corr.*, No. 18 C 00282, 2019 WL 2576546, at *3 (N.D. Ill. June 24, 2019) ("Therefore, neither the Department nor the State may be sued for violations of the Illinois Constitution in federal court."); *Illinois Clean Energy Community Foundation v. Filan*, No. 03 C 7596, 2004 WL 1093711, at *1, 3 (N.D. Ill. April 30, 2004) (claims under Illinois Constitution barred by Eleventh Amendment); *see also Cassell v. Snyders*, No. 20 C 50153, 2020 WL 2112374, at *11 (N.D. Ill. May 3, 2020) (holding, in deciding motion for preliminary injunction in case challenging COVID-19 executive order, that "the Eleventh Amendment almost certainly forecloses Plaintiffs' state law claims"). For all these reasons, Plaintiff's claims under the Illinois Constitution should be dismissed in their entirety.

## II. Plaintiff's Preliminary Injunction Motion Should Be Denied.

Injunctive relief is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (internal quotations omitted). The plaintiff "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of

preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Illinois Republican Party v. Pritzker*, No. 20-2175, 2020 WL 5246656, at *2 (7th Cir. Sept. 3, 2020), *quoting Winter v. Nat'l Resources Defense Council*, 555 U.S. 7, 20 (2008). If the plaintiff satisfies all these requirements, then the court must weigh the harm that the plaintiffs will incur without an injunction against the harm to the defendant if one is entered, and "consider whether an injunction is in the public interest." *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019) (internal quotations omitted). This analysis is done on a "sliding scale"—if the plaintiffs are less likely to win on the merits, the balance of harms must weigh more heavily in their favor, and vice versa. *Id.* (internal quotations omitted).

Here, the interim injunction Plaintiff requests in its present motion would give it substantially all the relief it seeks through this lawsuit. In such cases, the plaintiff's burden is even higher. *See, e.g.*, *Boucher v. Sch. Bd. of Sch. Dist. of Greenfield*, 134 F.3d 821, 827 (7th Cir. 1998) ("A preliminary injunction that would give the movant substantially all the relief he seeks is disfavored, and courts have imposed a higher burden on a movant in such cases.").

### A. Plaintiff has no likelihood of success on the merits.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits." *Winter*, 555 U.S. at 20. As the Seventh Circuit explained just yesterday, "a possibility of success is not enough," and the Supreme Court has expressly disapproved the "better than negligible" standard. *Illinois Republican Party*, 2020 WL 5246656, at *2. A plaintiff seeking preliminary relief "bears a significant burden" and must make a "strong showing" that it is likely to succeed on the merits. *Id*. While this showing does not require proof by a preponderance of the evidence, it "normally includes a demonstration of how the applicant proposes to prove the key elements of its case." *Id*.

Even if a plaintiff makes the required showing, the court must determine how likely it is that the plaintiff actually will succeed: "The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984). Moreover, when there are "two equally credible versions of the facts the court should be highly cautious in granting an injunction without the benefit of a full trial." *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1440 (7th Cir. 1986) (citation omitted).

For the reasons explained above in support of the Governor's Motion to Dismiss, Plaintiff fails to establish a likelihood of success on the merits of its claims. Because Plaintiff has little chance of success on the merits, the balance of harms must weigh very heavily in its favor. However, as discussed below, the balance of harms actually weighs strongly *against* granting a preliminary injunction.

### B. Plaintiff cannot demonstrate irreparable harm.

Even if Plaintiff could show likelihood of success on the merits, it has not shown that it will "*likely* suffer irreparable harm" absent injunctive relief, as is required. *Orr v. Shicker*, 953 F.3d 490, 502 (7th Cir. 2020) (movant must show "more than a mere possibility of harm") (quotation omitted) (emphasis in original). *Harlan v. Scholz*, 866 F.3d 754 (7th Cir. 2017), is instructive in this context. In *Harlan*, the plaintiffs alleged that the State's implementation of election-day registration, which allowed less populous rural counties to opt out of providing in-precinct registration, favored urban, Democratic voters, and burdened rural, Republican voters. *Id*. at 755-56, 761. In support of their claims of irreparable harm, the plaintiffs submitted an expert report from a political scientist from the University of Georgia. *Id*. at 757. However, the Seventh Circuit found that the plaintiffs' expert report came "nowhere close to demonstrating that Illinois voters would suffer any harm at all—let alone irreparable harm." *Id*. at 758.

Here, Plaintiff falls far short of the level of evidence that the Seventh Circuit deemed "nowhere close." As discussed above, Plaintiff has not even alleged *injury* from the May Amendments, much less "irreparable harm." Moreover, Plaintiff has presented no evidence at all for any of its alleged harms are likely to occur. Instead, Plaintiff relies entirely on speculation, innuendo, and news reports of isolated incidents from other jurisdictions. This falls far short of showing that Plaintiff is "likely" to suffer harm.

In fact, studies show that instances of fraud relating to voting by mail are relatively rare. For example, in 2017, the State Board, in response to a request for information from the Presidential Advisory Commission on Election Integrity, reported that "Illinois elections have a very low incidence of misconduct," and that the "suspected instances we found equate to a fraud level of a couple thousandths of a single percent of the votes cast in the state."[21] According to the Brennan Center for Justice, a nonpartisan law and policy institute, more than 31 million Americans cast ballots by mail in 2018.[22] Despite this dramatic increase in mail voting over time, fraud rates "remained infinitesimally small." *Id.* Additionally, "none of the five states that hold their elections primarily by mail has had any voter fraud scandals since making that change." *Id.* For example, Oregon sent out more than 100 million mail-in ballots since 2000, and has documented only about a dozen cases of proven fraud." *Id.* "Rounded to the seventh decimal point, that's 0.0000001 percent of all votes cast." *Id.*

---

[21] Letter from Kenneth R. Menzel, General Counsel, Illinois State Board of Elections, to the Hon. Kris W. Kobach, Vice Chair, Presidential Advisory Commission on Election Integrity (Sept. 19, 2017), attached as Exhibit B and *available at* https://www.elections.il.gov/Downloads/AboutTheBoard/PDF/09-19-2017_PACEI_Letter.pdf (last visited Sept. 4, 2020).

[22] Wendy R. Weiser and Harold Ekeh, *The False Narrative of Vote by Mail Fraud*, BRENNAN CENTER FOR JUSTICE (April 10, 2020), *available at* https://www.brennancenter.org/our-work/analysis-opinion/false-narrative-vote-mail-fraud (last visited Aug. 31, 2020).

Moreover, according to research conducted by the Heritage Foundation—an organization invested in "[p]reventing, deterring, and prosecuting election fraud" — there have only been 1,296 cases of proven voter fraud in the United States dating back to 1982.[23] Moreover, the Heritage Foundation has identified only 16 cases of voter fraud in Illinois involving the fraudulent use of absentee ballots, with the earliest instance being in 2004.[24] The Eleventh Circuit, when considering Alabama's absentee voting rules, found that 16 instances of absentee voter fraud in that state constituted "a nearly non-existent problem" that could not outweigh the "potential life-or-death burden placed on high-risk Alabamian voters [by] the absentee-ballot requirements." *People First of Alabama v. Sec'y of State for Alabama*, No. 20-12184, 2020 WL 3478093, at *7 (11th Cir. June 25, 2020) (Rosenbaum, J. and Pryor, J., concurring) (declining to stay injunction of absentee ballot requirements).

Finally, Plaintiff's lengthy delay in moving for a preliminary injunction also "undercuts [its] claims of irreparable harm" and "may be considered as circumstantial evidence that the potential harm to [Plaintiff] is not irreparable or as great as claimed." *Fenje v. Feld*, No. 01 C 9684, 2002 WL 1160158, at *2 (N.D. Ill. May 29, 2002); *see also Shady v. Tyson*, 5 F. Supp. 2d 102, 108-09 (E.D.N.Y. 1998). SB 1863 was passed and approved on May 22, 2020 and signed by the Governor on June 16, 2020 (Dkt. 1 ¶ 11 n.1), nearly two months before Plaintiff filed the present motion for a preliminary injunction. And even once Plaintiff filed its motion, it did not seek a prompt resolution of the motion, but instead noticed the motion up for August 28, 2020,

---

[23] *A Sampling of Recent Election Fraud Cases from Across the United States*, THE HERITAGE FOUNDATION, *available at* https://www.heritage.org/voterfraud (last visited Aug. 31, 2020).

[24] *Election Fraud Cases*, THE HERITAGE FOUNDATION, *available at* https://www.heritage.org/voterfraud/search?combine=&state=IL&year=&case_type=All&fraud_type=24489&page=0 (last visited Aug. 31, 2020) (select Illinois and "Fraudulent Use of Absentee Ballots" under "Type of fraud").

18 days later. Nothing prevented Plaintiff from filing this lawsuit and moving for injunctive relief months ago, and Plaintiff's delay further confirms that there is no irreparable harm here.

### C.    The balance of harms weighs decidedly against injunctive relief.

Under the "balance of harms" portion of the analysis, Plaintiff must establish that "the harm [it] would suffer without the injunction is greater than the harm that preliminary relief would inflict on the defendants." *Mich. v. U.S. Army Corps of Eng'g*, 667 F.3d 765, 769 (7th Cir. 2011). The balance of hardships "takes on heightened importance when the plaintiff requests a 'mandatory injunction,'" which "imposes significant burdens on the defendant and requires careful consideration of the intrusiveness of the ordered act." *Kartman v. State Farm Mut. Auto. Ins. Co.*, 635 F.3d 883, 892 (7th Cir. 2011). Because a movant need not establish that it is more likely than not that it will succeed on the merits to obtain injunctive relief, a movant "must compensate for the lesser likelihood of prevailing by showing the balance of harms tips *decidedly* in favor of the movant." *Boucher*, 134 F.3d at 826 n.5 (emphasis in original). The court also should consider whether a preliminary injunction would harm the public interest. *Illinois Republican Party*, 2020 WL 5246656, at *2.

Here, the balance of harms weighs heavily against entry of a preliminary injunction. First, as discussed above, the purpose of the May Amendments was to increase access to absentee voting and reduce crowding at polling places so as to maximize citizens' ability to vote while reducing the risk of spreading COVID-19 at polling places. In its motion, Plaintiff completely ignores the devastating toll of a pandemic that has ravaged Illinois and is more likely to reach voters if the May Amendments are enjoined. Instead, Plaintiff simply asserts that the "existence of COVID-19 this year in no way increases the need for ballot harvesting." Dkt. 6 at 14-15. But as discussed above, Plaintiff is not entitled to substitute its judgment for that of the General

Assembly and the Governor. Given its failure to address the *Jacobson* standard, Plaintiff overestimates the power of its constitutional arguments.

Plaintiff also turns a blind eye to a once-in-a-lifetime health crisis. As one court in this district recently found, "the balance of hardships tilts markedly" in favor of social-distancing measures; deciding otherwise "would pose serious risks to public health. . . . COVID-19 is a virulent and deadly disease that has killed thousands of Americans and may be poised to devastate the lives of thousands more." *Cassell v. Snyders*, No. 20 C 50153, 2020 WL 2112374, at *15 (N.D. Ill. May 3, 2020); *see also Elim Rom. Pentecostal Church v. Pritzker*, No. 20 C 2782, 2020 WL 2468194, at *6 (N.D. Ill. May 13, 2020) ("The harm to plaintiffs if the Order is enforced pales in comparison to the dangers to society if it is not."). As the Eleventh Circuit recently observed, the State and the people have a compelling interest in enabling citizens to vote safely.

> [A]nyone may risk getting hit by a bus on the way to a polling station. But that doesn't mean we set up polling stations in the middle of the street. Appellants' failure to acknowledge the significant difference between leaving one's home to vote in non-pandemic times and forcing high-risk COVID-19 individuals to breach social-distancing and self-isolation protocols so they can vote reflects a serious lack of understanding of or disregard for the science and facts involved here.

*People First of Alabama*, 2020 WL 3478093, at *7.

Plaintiff's baseless fears of voter fraud does not compare favorably to the risk of further spread of COVID-19 and any subsequent loss of life that could result from making it more difficult for citizens to vote by mail rather than requiring them to stand in long lines at their regular polling places. Large, in-person indoor gatherings can easily result in further spread of the disease. COVID-19 will remain a serious threat well past the November election. *Thomas v. Andino*, No. 3:20-CV-01552, 2020 WL 2617329, at *17 n.20 (D.S.C. May 25, 2020) (" [I]t is relatively difficult to vote in person without risking the possibility of infection, especially for

38

those who are more susceptible to the ravaging harms of COVID-19."). Accordingly, the Court should deny Plaintiff's request to upend the General Assembly's lawful, effective public health measures. To do otherwise would be to risk actual disenfranchisement of voters who are unable to vote in-person because of the threat posed by COVID-19. *Id.* ("[D]uring this pandemic, absentee voting is the safest tool through which voters can use to effectuate their fundamental right to vote. To the extent that access to that tool is unduly burdened, then no matter the label, 'denial of the absentee ballot is effectively an absolute denial of the franchise [and fundamental right to vote].'"); *see also Paher v. Cegavske*, No. 320CV00243, 2020 WL 2089813, at *12 (D. Nev. Apr. 30, 2020) ("The Court therefore concludes that, at minimum, the Plan's all-mail election implementation to protect the public during a public health crisis tips the scale of equity in favor of Defendants and Intervenor-Defendants (i.e., against the issuance of an injunction)").

Even aside from the risks of COVID-19, the harm to Defendants and the public is significant if preliminary injunctive relief is granted. As the Fourth Circuit has observed: "By definition, '[t]he public interest ... favors permitting as many qualified voters to vote as possible.'" *League of Women Voters of N. Carolina v. N. Carolina*, 769 F.3d 224, 247 (4th Cir. 2014), *quoting Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012). Over the years, the Illinois General Assembly has worked to enable as many voters as possible by extending voter registration,[25] expanding early voting,[26] and expanding absentee voting.[27] Thus, the State has demonstrated its compelling interest in enabling as many qualified voters as possible to vote, without increasing their risk of contracting COVID-19. This interest will be frustrated if

---

[25] The General Assembly created and then extended "grace period registration," from 28 to 14 days before election day (P.A. 93-1082), then to seven days before election day (P.A. 96-441), then to three days before election day (P.A. 97-766), and finally to election day itself (P.A. 98-1171).

[26] *See, e.g.,* P.A. 98-1171 (setting early voting to begin the 40th day before the election and extending through the day before the election, thus extending the early voting period from 13 days to 40 days).

[27] *See* "Voting by Mail in Illinois" in the Background section above.

Plaintiff's motion is granted. Moreover, Plaintiff's motion should be denied because "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Proft v. Madigan*, 340 F. Supp. 3d 683, 695 (N.D. Ill. 2018), *aff'd sub nom. Proft v. Raoul*, 944 F.3d 686 (7th Cir. 2019), *quoting Maryland v. King*, 567 U.S. 1301, 1301 (2012) (Roberts, C.J., in chambers).

Moreover, Plaintiff's delay in moving for a preliminary injunction increases the harm to the State and to the public and cuts against granting its motion. In *Nader v. Keith*, 385 F.3d 729, 736 (7th Cir. 2004), the Seventh Circuit held that "it would be inequitable" to grant preliminary relief to a candidate who filed suit seeking access to the ballot "so gratuitously late in the campaign season." *Id*. In that case, Nader filed suit on June 27—*six weeks earlier* than Plaintiff filed its motion for a preliminary injunction. The court found that "[b]y waiting as long as he did to sue, . . . Nader created a situation in which any remedial order would throw the state's preparations for the election into turmoil." *Id*. Recently, a Nevada district court found that the plaintiffs' delay in bringing their renewed preliminary injunction motion was significant enough to constitute laches. *Paher v. Cegavske*, No. 320CV00243, 2020 WL 2748301, at *6 (D. Nev. May 27, 2020). The *Paher* court concluded that, "[e]ven if Plaintiffs' preliminary injunction request was on firmer grounds," it could not "foresee any viable manner of undoing the Plan or stopping its further implementation without increasing the risks to the health and safety of Nevadans and putting the integrity of the election at risk—particularly without sufficient time to prepare an adequate alternative." *Id*.

Here, too, a last-minute preliminary injunction of the May Amendments would impose "significant burdens" not just on the Defendants, but on the 108 election authorities across the State that are responsible for administering this election. *Tripp v. Smart*, No. 14-CV-0890, 2014 WL 4457200, at *6 (S.D. Ill. Sept. 10, 2014) (candidates who filed preliminary injunction

motion in August imposed "significant burdens" on county clerks and "broad public consequences"). Any injunction at this late date could present "significant difficulties, include with the location of polling places and delivery of voting equipment, the recruitment and training of election judges, programming of voting equipment and the delivery of ballots to voters." Declaration of Edmund Michalowski, Deputy Clerk of Elections for the Cook County Clerk, attached as Exhibit C, at ¶ 5.

For example, if the Court prohibits voters from giving their ballot to another individual to turn in, the election authorities will need to reprint the ballots, which include instructions based on the current Election Code. However, under federal law the county clerks must send out overseas and military ballots by September 18, 2020 (42 U.S.C. § 1973ff-1(a)(i)(A); 10 ILCS 5/16-5.01), and will begin mailing out absentee ballots to voters in the United States by September 24, 2020. 10 ILCS 5/19-4; *see* Ex. C. ¶ 5; Declaration of Lance Gough, Executive Director at the Chicago Board of Elections, attached as Exhibit D, at ¶ 9. Thus, if this Court grants Plaintiff's motion, the county clerks would need to scramble to reprint these ballots. *Id*.

If the Court were to enjoin 10 ILCS 5/2B-10, which makes Election Day a holiday for all government workers, election authorities would also be harmed. Election authorities faced difficulties in the March primary election because many privately owned polling places were not available (*see* Background section above), and are already facing significant difficulties finding available sites for early voting sites and polling places for the November election.[28] For example, in the March primary, 81 of 900 polling places in suburban Cook County and more than 100

---

[28] Kelli Smith, '*We're in uncharted waters:' Illinois counties rush to finalize early voting sites*, CHICAGO TRIBUNE (Aug. 25, 2020), *available at* https://www.chicagotribune.com/news/breaking/ct-coronavirus-illinois-early-voting-sites-20200828-jee43gcdgfgbfdkbikb5u25kje-story.html (last visited Aug. 31, 2020) (detailing the difficulties that election authorities in McHenry, DuPage, Cook, Will, and Lake Counties have had with securing early voting sites and Election Day polling places).

polling places in Chicago withdrew as polling places due to COVID-19 issues. Ex. C at ¶ 2, Ex. D at ¶ 11. In the November election, many privately owned polling places will not be available to the election authorities. Ex. C at ¶ 2. Section 2B-10 ensures that schools and other government buildings will be available and requires that they be available as polling places. If these schools and other government buildings are not available, election authorities may not have enough polling places to meet CDC guidelines. *See* note 28; Ex. C at ¶ 3 (stating that less than 10% of the polling locations for the November election will be located in private nongovernmental buildings and stating that if schools and other government buildings were not available, "it will create difficulty for the Clerk to secure sufficient polling place to meet CDC and Illinois Department of Public Health Polling Place safety guidelines."

Similarly, if 10 ILCS 5/2B-40(a) were enjoined, election authorities may not have enough election judges to staff polling places. In suburban Cook County, over 2,000 election judges (out of over 7,000) dropped out of the March primary, as did "hundreds" of election judges in Chicago. Ex. C at ¶ 2; Ex. D at ¶ 11. Approximately 68 to 70% of election judges in Cook County are 55 years of age or older (*id*. ¶ 4), and therefore at high risk for COVID-19, as are many other election judges across Illinois. *See* note 7. If the Court were to enjoin 10 ILCS 5/2B-40(a), Cook County and other election authorities may have difficulty recruiting sufficient election judges to fully staff the November election. Ex. C at ¶ 4.

Finally, provisions of the May Amendments have been publicized widely throughout the State, including in media appearances, public notices, social media, information on election authority websites, and mass mailings, including the ballot applications that were mailed out earlier this month. Ex. C at ¶ 6. Thus, it is likely that voters would rely on these provisions, and a last-minute change increases voter confusion and the risk that their votes will not be counted. *See id.; Paher*, 2020 WL 2089813, at *12 (finding that "such disenfranchisement could be, even

more concretely, claimed in the absence of the Plan (and additionally by confusion that may result by the Court enjoining the Plan, and appeal—which would surely follow)"). This latter consideration is particularly critical here, as the Supreme Court has cautioned that "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion. . . . As an election draws closer, that risk will increase." *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006); *see also Republican Nat'l Comm. v. Democratic Nat'l Comm*., 140 S. Ct. 1205, 1207 (2020) (The Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election."). This Court "has an obligation to protect the innocents who will be harmed if a last-minute injunction disrupts the orderly administration of the upcoming election." *Summers v. Smart,* 65 F. Supp. 3d 556, 567 (N.D. Ill. 2014). The harm to the State and the public thus weighs decidedly against granting Plaintiffs' motion.

## CONCLUSION

For the foregoing reasons, Defendant Pritzker respectfully requests that the Court dismiss Plaintiff's Complaint with prejudice and deny Plaintiff's motion for a preliminary injunction.

Respectfully submitted,

KWAME RAOUL
Attorney General of Illinois

/s/ *Sarah H. Newman*
Sarah H. Newman
Hal Dworkin
Assistant Attorneys General
General Law Bureau
100 W. Randolph, 13th Floor
Chicago, Illinois 60601
312-814-3000
snewman@atg.state.il.us
hdworkin@atg.state.il.us

*Counsel for Defendant Governor JB Pritzker*