**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| COOK COUNTY REPUBLICAN PARTY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 20-cv-4676 |
| v. | ) | |
| | ) | |
| J.B. PRITZKER *et al.*, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| DCCC, | ) | |
| | ) | |
| Intervenor-Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER
DENYING MOTION FOR PRELIMINARY INJUNCTION**

Nearly two months after Illinois amended its Election Code in light of the ongoing COVID-19 pandemic, the Cook County Republican Party ("Plaintiff") filed a complaint [1] challenging certain of these amendments and moved for a preliminary injunction [5]. Because election authorities must soon mail absentee ballots, Plaintiff's delay in filing suit and requesting injunctive relief manufactured an emergency of sorts, requiring expedited briefing and ruling. The Court has now considered all briefing on the matter in order to promptly rule on the motion for preliminary injunction [5]. In doing so, the Court recognizes the importance of safely managing a public health crisis and the difficulty faced by chief executives and legislatures in balancing competing interests during such emergencies. See *Jacobson v. Massachusetts*, 197 U.S. 11, 29 (1905); *Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341, 347 (7th Cir. 2020). The Court also is mindful of the critical importance of secure elections to a functioning democracy. Plaintiff's claims raise concerns about election security, but in the end its contentions amount to legislative policy

disagreements and unsupported speculation about potential criminal conduct. The "Constitution is not an election fraud statute," *Bodine v. Elkhart Cnty. Election Bd.*, 788 F.2d 1270, 1271 (7th Cir. 1986)), and the May Amendments amount to "quintessentially * * * legislative judgment[s] with which we judges should not interfere unless strongly convinced that the legislative judgment is grossly awry." *Griffin v. Roupas*, 385 F.3d 1128, 1131 (7th Cir. 2004). As described in more detail below, Plaintiff fails to demonstrate that it will suffer irreparable harm absent injunctive relief or that it has some likelihood of success on the merits. Thus, the Court denies Plaintiff's motion for a preliminary injunction [5].

## I.     Background

In May of this year, the Illinois General Assembly made "certain modifications to the administration and conduct of the elections for the November 2020 general election" in order to "protect the safety, health, and rights of the people of Illinois" during the ongoing COVID-19 pandemic. 2020 Ill. Legis. Serv. Pub. Act 101-642 ("May Amendments"). Governor Pritzker signed the May Amendments into law on June 16, 2020. *Id.* Relevant here,[1] these modifications

- State that "any vote by mail ballot received by an election authority shall be presumed to meet the requirements of Articles 17, 18, and 19" of the Election Code, 10 Ill. Comp. Stat. 5/2B-20(b);

- Require election authorities to "accept any vote by mail ballot returned, including ballots returned with insufficient or no postage," *id.* at 5/2B-20(e)

- Permit election authorities to "establish secure collection sites for the postage-free return of vote by mail ballots," *id.*;

---

[1] Plaintiff's complaint also takes issue with a provision requiring election authorities to send an application for a mail-in ballot to electors who have applied to vote by an official ballot in certain previous elections. [1, at 5–6] (citing 10 Ill. Comp. Stat. 5/2B-15(b)). But Plaintiff acknowledges [6, at 15] that "millions of ballot applications were [already] mailed" on August 1, prior to the commencement of this lawsuit on August 10. Consistent with that recognition, in its motion for preliminary injunction, Plaintiff requests the Court to "enjoin the remaining provisions of" the May Amendments. [*Id.*] Thus, this order does not evaluate Section 5/2B-15(b).

- Require that three out of three election judges agree that a "signature on the certification envelope and the signature used by the election authority for verification purposes do not match or the certification envelope contains a signature but not in the proper location" in order to reject a mail-in ballot based on the signature, *id.* at 5/2B-20(c);

- Permit individuals 16 and older to serve as election judges, *id.* at 5/2B-40(a);

- Permit voters casting provisional ballots 14 days to provide "the election authority with the necessary documentation" to cure the provisional ballot, *id.* at 5/2B-35(e);

- Extend observation of the 2020 General Election Day holiday to all state workers and close all government offices except for election authorities, *id.* at 5/2B-10; and

- Require the State Board of Elections to make electronic lists ("absentee voter lists") of the names and addresses of electors who were automatically sent an application for a mail-in ballot and of electors who applied for a mail-in ballot by specified dates "accessible to State and local political candidates and committees," *id.* at 5/2B-50(a).

On August 10, 2020—nearly two months after enactment of the May Amendments—Plaintiff filed a complaint [1] against Governor Pritzker, Board Members of the Illinois State Board of Elections, Cook County Clerk Karen Yarbrough, and the Commissioners of the Chicago Board of Election Commissioners. The Court later granted DCCC's unopposed motion to intervene as a Defendant [15]. (Although Defendants have filed multiple briefs, the Court refers to them collectively as "Defendants" throughout this opinion.) Plaintiff alleges that the May Amendments violate the First and Fourteenth Amendments and Article III, Section 4 of the Illinois Constitution by enabling voter-dilution disenfranchisement (Count I) and direct disenfranchisement (Count II). [1, at 16–19]. Specifically, Plaintiff alleges that the May Amendments permit "ballot harvesting," which, according to Plaintiff, is "the practice by which paid, political operatives collect ballots from voters and return them to the election authority." [6, at 3]. Plaintiff claims that such a practice enables "a paid, partisan operative [to] collect Democratic mail-in ballot applications and ballots to ensure that they are turned in and counted and [to] collect Republican mail-in ballot applications and ballots to ensure that they are not." [1, at 11]. As detailed further below, Plaintiff also asserts

that the May Amendments will cause other forms of fraud, such as individuals impersonating voters and election judges intentionally accepting fraudulent mail-in ballots. [*Id.*, at 17–19]. Plaintiff also contends that by permitting the distribution of absentee voter lists and by overwhelming the Postal Service with mail-in ballots, the May Amendments violate Article III, Section 4 of the Illinois Constitution, which calls for the "secrecy of voting" (Count III). [*Id.*, at 19]. Simultaneous with filing its complaint, Plaintiff moved for a preliminary injunction, requesting that the Court enjoin the May Amendments. [5].

## II. Analysis

### A. Standing

As a preliminary matter, Defendants assert that Plaintiff does not have standing to seek injunctive relief. [42, at 5–10] [49, at 13–23]. "To assert standing for injunctive relief, [Plaintiff] must show that [it is] under an actual or imminent threat of suffering a concrete and particularized 'injury in fact'; that this injury is fairly traceable to the [Defendants'] conduct; and that it is likely that a favorable judicial decision will prevent or redress the injury." *Common Cause Indiana v. Lawson*, 937 F.3d 944, 949 (7th Cir. 2019). Defendants argue that Plaintiff lacks standing primarily because it cannot meet the injury-in-fact requirement. This prong requires that Plaintiff show that it "is immediately in danger of sustaining some direct injury" and that "the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (finding no injury in fact warranting injunctive relief because man allegedly previously put in illegal chokehold by police could not demonstrate that he would again be subject to illegal chokehold); see also *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013) (finding no injury in fact based on "potential future surveillance" when plaintiff could not demonstrate that such injury was "certainly impending").

4

Here, Plaintiff's alleged injury arises from potential fraud resulting from the May Amendments. For example, Plaintiff asserts that partisan operatives will collect but fail to submit Republican ballots; that state workers with election day off will impersonate voters; and that election judges will accept mail-in ballots with fraudulent signatures if those ballots likely contain Democratic votes. [1, at 16–19]. But apart from a citation to the "notorious" history of election fraud in Illinois in the last century (see *Nader v. Keith*, 385 F.3d 729, 733 (7th Cir. 2004)), the examples of such fraudulent activity referenced in Plaintiff's briefs come from other states: North Carolina [see 6, at 7; 55, at 4 n.2], Indiana [see 6, at 7-8], New Jersey [see 55, at 8-10], and Georgia [see *id*. at 12-13]. The isolated incidents cited lend support to the proposition that over time voter fraud rates have "remained infinitesimally small." [See 49, at 35] (quoting Wendy R. Weiser & Harold Ekeh, *The False Narrative of Vote-by-Mail Fraud*, BRENNAN CENTER FOR JUSTICE (Apr. 10, 2020), https://www.brennancenter.org/our-work/analysis-opinion/false-narrative-vote-mail-fraud). They also raise a concern that the injuries postulated in support of the relief sought in this motion are "conjectural" or "hypothetical," not "real and immediate." *Lyons*, 461 U.S. at 102. But the Court need not rule definitively on standing at this stage[2] because, as explained below, even if Plaintiff has standing to seek a preliminary injunction, it has not demonstrated an entitlement to relief. See *Simic v. City of Chicago*, 851 F.3d 734, 737–38, 740 (7th Cir. 2017) (affirming denial of preliminary injunction and noting that "[a] district court * * * can address a motion for a preliminary injunction without making a conclusive decision about whether it has subject matter jurisdiction").

---

[2] The Court notes that standing is also a subject of Defendants' motions to dismiss, [42, 510] [49, at 13–23], briefing for which will not conclude until September 18, 2020. [37].

B.      **Motion for Preliminary Injunction**

1.      **Legal Standard**

"A preliminary injunction is an extraordinary remedy." *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017). As such, Plaintiff must make a "threshold" demonstration that "(1) 'absent a preliminary injunction, it will suffer irreparable harm in the interim period prior to final resolution of its claims'; (2) 'traditional legal remedies would be inadequate'; and (3) 'its claim has some likelihood of succeeding on the merits.'" *Valencia v. City of Springfield*, 883 F.3d 959, 965 (7th Cir. 2018) (quoting *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of United States of Am., Inc.*, 549 F.3d 1079, 1085 (7th Cir. 2008)). If the Plaintiff satisfies this threshold demonstration, the Court then "engage[s] in a balancing analysis[] to determine whether the balance of harm favors the moving party or whether the harm to other parties or the public sufficiently outweighs the movant's interests." *Whitaker*, 858 F.3d at 1044. In doing so, "the court employs a sliding scale approach: '[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor.'" *Girl Scouts*, 549 F.3d at 1086 (alteration in original) (quoting *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984)).

a.      **Risk of Irreparable Harm and Adequacy of Traditional Legal Remedies**

Plaintiff must first demonstrate that "irreparable injury is likely in the absence of an injunction"—"just a possibility" of such injury is insufficient. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 21–22 (2008) (emphasis omitted). Moreover, "speculative injuries do not justify" the grant of a preliminary injunction. *E. St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 704 (7th Cir. 2005). "[A] preliminary injunction will not be issued simply to prevent the possibility of some remote future injury. A presently existing actual threat

must be shown." *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 788 (7th Cir. 2011) (modification in original) (quoting 11A Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 2948.1, at 154–55 (2d ed. 1995)). Plaintiff must also demonstrate that it "has no adequate remedy at law." *Harlan v. Scholz*, 866 F.3d 754, 758 (7th Cir. 2017).

Plaintiff argues that it will be harmed by the May Amendments because they will give rise to fraud that will in turn dilute the Republican vote and otherwise disenfranchise Republican voters. As noted above, Plaintiff asserts that partisan operatives will collect but fail to submit Republican ballots; that state workers with election day off will impersonate voters; and that election judges will accept ballots with fraudulent signatures if those ballots likely contain Democratic votes. [1, at 17–19]. Plaintiff also postulates that the "massive increase in mail-in ballots will overwhelm local election authorities and undermine the systems for not identifying ballots," thereby encroaching on the secrecy of the vote protected by the Illinois Constitution. [6, at 13]. And Plaintiff submits that these harms are irreparable because the infringement on the right to vote cannot be cured by money damages or any other post-election remedy. [*Id.*, at 5].

In support of these allegations, Plaintiff cites to Seventh Circuit caselaw and several news articles[3] describing voter fraud related to absentee ballots. [6, at 7–8, 11–12]; [55, 8–12]. But these sources fail to demonstrate that Plaintiff is likely to suffer irreparable injury. First, Plaintiff cites to *Nader v. Keith*, 385 F.3d 729 (7th Cir. 2004), which stated that Illinois is "a state as notorious for election fraud." [6, at 8] (quoting *Nader*, 385 F.3d. at 734). And Plaintiff asserts that "this finding * * * is controlling on this Court's analysis." [55, at 4]. As support for the

---

[3] The Court may take judicial notice of the existence of the news articles cited by the parties because their existence is "(1) not subject to reasonable dispute and (2) either generally known within the territorial jurisdiction or capable of accurate and ready determination through sources whose accuracy cannot be questioned." *Ennenga v. Starns*, 677 F.3d 766, 773–74 (7th Cir. 2012). As to the content of the articles, even if the Court were to accept all sources as accurate, Plaintiff is not entitled to a preliminary injunction.

existence of election fraud in Illinois, *Nader* cites to 1983 Senate hearings and two law review articles, one that cites to those hearings and one that recounts allegations of election fraud in the 1960 presidential election. See *Nader*, 385 F.3d. at 733 (citing *Voting Rights Act: Criminal Violations: Hearings Before Subcomm. on the Const. of the S. Comm. on the Judiciary*, 98th Cong. 4 (1983); Todd J. Zywicki, *The Law of Presidential Transitions and the 2000 Election*, 2001 B.Y.U. L. REV. 1573, 1608 (2001); Danya L. Cunningham, *Who Are to Be the Electors? A Reflection on the History of Voter Registration in the United States*, 9 YALE L. & POL'Y REV. 37, 396–97 (1991)). But Plaintiff makes no attempt to explain how those historical facts make it likely that the type of widescale fraud it describes will occur as a result of the May Amendments. And it fails to cite any authority explaining how such previous findings of historical fact from decades ago bind this Court such that it must find irreparable harm here.

Plaintiff's news articles suffer a similar fate. Plaintiff cites to several articles describing past voter fraud. For example, Plaintiff refers to an article reporting that the prevailing candidate in a 2018 North Carolina race for the United States House of Representatives agreed that a new election should be called amid an investigation into ballot harvesting and tampering. [6, at 7] (citing Doug Bock Clark, *The Tearful Drama of North Carolina's Election-Fraud Hearings*, NEW YORKER (Feb. 24, 2019), https://www.newyorker.com/news/dispatch/the-tearful-drama-of-north-carolinas-election-fraud-hearings). And in its reply brief, Plaintiff relies heavily on a New York Post article detailing fraud in New Jersey as described by an anonymous source. [55, at 8–12] (citing Jon Levine, *Confessions of a Voter Fraud: I Was a Master at Fixing-Mail-in Ballots*, NY POST, (Aug. 29, 2020, 5:24 PM), https://nypost.com/2020/08/29/political-insider-explains-voter-fraud-with-mail-in-ballots). For example, the source describes steaming open envelopes containing completed ballots to replace them with fraudulent ones and hiring mail carriers to throw

out ballots in certain areas. But Plaintiff again makes no attempt to explain how these articles make the commission of similar fraud in Illinois anything more than speculative, as opposed to a "presently existing actual threat." *U.S. Army Corps of Engineers*, 667 F.3d at 788 (quoting 11A Charles Alan Wright & Arthur R. Miller, at 154–55)).

To be clear, the fraud described by these articles is not only abhorrent but also illegal. For example, under Illinois law, a person commits a Class 3 felony by "mark[ing] or tamper[ing] with a vote by mail ballot of another person" or by "tak[ing] a vote by mail ballot of another person in violation of Section 19-6 so that an opportunity for fraudulent marking or tampering is created." 10 Ill. Comp. Stat. 5/29-20. A person commits a Class 4 felony by "add[ing] or mix[ing] a forged ballot with other ballots" or by "add[ing] or mix[ing] a forged application to vote with other applications to vote." *Id.* at 5/29-8. Further, the Election Code specifies that the "Criminal Code shall apply to solicitation, conspiracy and attempt to violate the provisions of this Code." *Id.* at 5/29-13. In other words, the actions described in these articles are criminal. If Plaintiff learns of such illegal activity, it should be reported it to the proper authorities. Indeed, as Plaintiff points out in its reply, authorities in other jurisdictions are currently investigating individuals suspected of voter fraud—such as voting twice in a single election—as "potential felons" [see 55, at 12], and Illinois officials possess the same power to investigate and indict those who engage in it.

Looking at the record compiled to date in this litigation, however, Plaintiff has provided no basis for concluding that its alleged harms are anything but speculative and therefore fails to demonstrate that "irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22; *cf. Harlan*, 866 F.3d at 758–59 (7th Cir. 2017) (determining that district court erred in finding plaintiff met irreparable-injury requirement when expert report did not sufficiently demonstrate

how election law would burden voting rights). And in the absence of any showing of irreparable harm, Plaintiff has necessarily failed to show that it "has no adequate remedy at law." *Id.* at 758.[4]

### b. Likelihood of Success on the Merits

Plaintiff insists that it must only "show that it has a better than negligible chance of success on the merits of at least one of its claims" and that Defendants are wrong to suggest otherwise. [55, at 2] (quoting *Girl Scouts*, 549 F.3d at 1096). To be sure, the Seventh Circuit has previously described this requirement as "negligible." *Girl Scouts*, 549 F.3d at 1096. But it recently explained that this "'better than negligible' standard was retired by the Supreme Court." *Illinois Republican Party v. Pritzker*, No. 20-2175, 2020 WL 5246656, at *2 (7th Cir. Sept. 3, 2020); see also *Mays v. Dart*, 2020 WL 5361651, at *7 (7th Cir. Sept. 8, 2020) (explaining that "better than negligible" "is not the proper standard to apply when evaluating the likelihood of success on the merits in a preliminary injunction motion"). Thus, "a mere possibility of success is not enough." *Illinois Republican Party*, 2020 WL 5246656, at *2. Instead, Plaintiff "must demonstrate that 'its claim has some likelihood of success on the merits.'" *Mays*, 2020 WL 5361651, at *8 (quoting *Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 381 (7th Cir. 2018)). "What amounts to 'some' depends on the facts of the case at hand because of [the] sliding scale approach" to balancing the harms: "the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa." *Id.* at *5, *8.

### i. State Claims

Defendants assert that Plaintiff's state-law claims arising from alleged violations of the Illinois Constitution have no likelihood of success on the merits because such claims are barred by

---

[4] The Court also notes that Plaintiff's own briefs demonstrate the possibility of non-monetary, post-election remedies, including a state election board order to hold a new election for a North Carolina seat in the U.S. House of Representatives [see 6, at 7] and a federal court order directing New York state election officials to count mail-in ballots previously declared invalid [see *id*. at 11].

the Eleventh Amendment. [42, at 11–12]; [49, at 31–32]. The Court agrees. In *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89 (1984), the Supreme Court explained that "[a] federal court's grant of relief against state officials on the basis of state law" "conflicts directly with the principles of federalism that underlie the Eleventh Amendment." *Id.* at 106. Thus, as the Seventh Circuit reaffirmed earlier this year, "a federal court cannot issue relief against a state under state law." *Elim Romanian Pentecostal Church*, 962 F.3d at 345. Plaintiff responds that the Court has supplemental jurisdiction over these state-law claims. [55, at 11 n.6]. But this assertion confuses subject matter jurisdiction with sovereign immunity, and the latter plainly trumps the former. See *Raygor v. Regents of the Univ. of Minn.*, 534 U.S. 533, 540–42 (2002) (holding that "§ 1367's grant of jurisdiction does not extend to claims against nonconsenting state defendants"). Accordingly, Plaintiff's state-law claims have no likelihood of success on the merits.

### ii. Federal Claims

The parties disagree on which standard applies to Plaintiff's federal claims. Plaintiff asserts that the Court should analyze its claims under the *Anderson-Burdick* framework. [6, at 6–7]. Under this "flexible standard,"

> [a] court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

*Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789, (1983)).

Defendants cast doubt on whether the *Anderson-Burdick* framework applies for two reasons. First, Defendants assert that because the State enacted the May Amendments in response to the ongoing COVID-19 pandemic, the Court should consider the more deferential standard from

*Jacobson v. Massachusetts*, 197 U.S. 11 (1905). [49, at 23–24]. There, the Supreme Court determined that a law requiring smallpox vaccinations during an epidemic did not violate liberty interests protected by the Fourteenth Amendment. *Id.* at 39. In doing so, the Court explained that

> in every well-ordered society charged with the duty of conserving the safety of its members the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand.

*Id.* at 29. To Defendants' point, the Seventh Circuit recently "looked to *Jacobson* for guidance" in determining the constitutionality of a state executive order limiting the size of gatherings to prevent the spread of COVID-19, concluding that "*Jacobson* takes off the table any general challenge to [the executive order] based on the Fourteenth Amendment's protection of liberty." *Illinois Republican Party*, 2020 WL 5246656, at *3. The Court recognizes the seriousness of the COVID-19 pandemic and *Jacobson*'s call for deference in the face of such "great dangers." *Jacobson*, 197 U.S. at 29; see also *Illinois Republican Party*, 2020 WL 5246656, at *3 (describing the COVID-19 pandemic as "a serious public-health crisis"). But determining how *Jacobson*'s principles translate to this election-law context is not necessary here. As explained below, even without applying any *Jacobson* deference, Plaintiff has not demonstrated a likelihood of success on the merits.

The Defendants next argue that the *Anderson-Burdick* framework applies to only laws that *restrict* the right to vote, and thus does not apply to the May Amendments because they *expand* that right. [42, at 15–16]; [49, at 27–28]; see also *Libertarian Party of Illinois v. Scholz*, 872 F.3d 518, 523 (7th Cir. 2017) (using the *Anderson-Burdick* framework to "evaluate ballot-access restrictions"). And, relying on *McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802 (1969), Defendants argue that rational basis review applies. [49, at 27–28]. In *McDonald*, pretrial detainees challenged an Illinois law making absentee ballots available to

certain groups, but not to them.  *Id.* at 803.  In determining whether the law violated the Equal Protection Clause of the Fourteenth Amendment, the Supreme Court considered whether the statute bore "some rational relationship to a legitimate state end" or whether it was "based on reasons totally unrelated to the pursuit of that goal."  *Id.* at 809.  As with Defendants' *Jacobson*-based objection, it is unnecessary to determine whether rational basis review applies because Plaintiff has not demonstrated a likelihood of success on the merits even under the more demanding *Anderson-Burdick* framework.

Applying that framework, for Plaintiff to demonstrate a likelihood of success on the merits, it must demonstrate that the "character and magnitude of the asserted injury" caused by the May Amendments outweigh the "precise interests put forward by the State as justifications for the burden imposed by its rule." *Anderson*, 460 U.S. at 789.  "Under this flexible standard, the level of scrutiny depends on the regulation at issue: the more severely it burdens constitutional rights, the more rigorous the inquiry into its justifications."  *Libertarian Party of Illinois*, 872 F.3d at 523–24.  And because Plaintiff makes a facial challenge to the May Amendments, the analysis of their validity must "not to go beyond [their] facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449–50 (2008); see also *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 201 (2008) (declining to invalidate voter ID law given the absence of "any concrete evidence of the burden imposed on voters").  As discussed below, Plaintiff has failed to make this showing for each challenged portion of the May Amendments.

### A.      "Ballot Harvesting"

Much of Plaintiff's complaint rests on the assertion that the May Amendments sanction ballot harvesting, defined by Plaintiff as "the practice by which paid, political operatives collect

ballots from voters and return them to the election authority." [6, at 3]. Plaintiff contends that such harvesting will result in the dilution-based and direct disenfranchisement of Republican votes because these operatives "may collect Democratic mail-in ballot applications and ballots to ensure that they are turned in and counted and may collect Republican mail-in ballot applications and ballots to ensure that they are not turned in and counted." [1, 11.] In support of its contention that the May Amendments will create such fraud, Plaintiff relies on several news stories reporting on ballot harvesting or other fraud in other jurisdictions, as described above. [6, at 7–8, 11], [55, at 8–12].

At the heart of Plaintiff's ballot-harvesting claim is the assumption that the May Amendments change the Election Code by permitting any individual to collect and return any other individual's mail-in ballot. As a basis for this assumption, Plaintiff cites to the following language: "Election authorities shall accept any vote by mail ballot returned, including ballots returned with insufficient or no postage." [6, at 3] (quoting 10 ILCS 5/2B-20(e)); see also [1, 12] (identifying this provision of the May Amendments as the provision that "allow[s] for ballot harvesting"). Plaintiff also implies that the provision of "secure collection sites for the postage-free return of vote by mail ballots" permits "anyone [to] return another person's ballot." [6, at 3] (second quoting 10 ILCS 5/2B-20(e)). And Plaintiff notes that other states "limit the return of ballots to voters or their close friends and relatives." [*Id.*, at 4].

But Plaintiff's argument rests on a misreading of the May Amendments, relies on sources that are not relevant here, and involves portions of the Election Code not altered by the May Amendments. First, as the Attorney General explains, no provision of the May Amendments "change[s] [the] Election Code's requirements regarding who may deliver a mail-in ballot." [49,

at 18.] The Election Code generally[5] makes it "unlawful for any person not the voter or a person authorized by the voter to take the ballot and ballot envelope of a voter for deposit into the mail." 10 Ill. Comp. Stat. 5/19-6. In addition, "[i]f the voter authorized a person to deliver the ballot to the election authority," the Election Code requires "the voter and the person authorized to deliver the ballot" to "complete [an] authorization printed on the exterior envelope supplied by an election authority for the return of the vote by mail ballot." *Id.* Moreover, the provision of a secure drop box says nothing to change who may place the ballot in the drop box. *Id.* 5/2B-20 ("Election authorities * * * may establish secure collection sites for the postage-free return of vote by mail ballots."). Therefore, contrary to Plaintiff's argument, the Election Code does not permit just anyone to return the voter's ballot. And it certainly does not permit anyone to systematically collect but fail to submit Republican ballots.

Second, as explained above, the sources on which Plaintiff relies do not demonstrate that Illinois faces the risk of illegal ballot harvesting or other fraud as a result of the May Amendments.

Third, to the extent that Plaintiff takes issue with the fact that the Election Code does not limit who a voter may authorize to deliver ballots to only close friends and relatives, Plaintiff challenges provisions of the Election Code outside of the May Amendments that are not included in its complaint or covered by its requested relief. Moreover, Plaintiff provides no evidence to demonstrate that the absence of such a limitation will lead to voter fraud.

Because the May Amendments do not permit ballot harvesting and Plaintiff fails to support its related claims of fraud, there is no potential ballot-harvesting "injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." *Burdick*, 504 U.S. at

---

[5] The Election Code includes an exception for "ballots issued pursuant to application by a physically incapacitated elector under Section 3-3 or a hospitalized voter under Section 19-13, in which case any employee or person under the direction of the facility in which the elector or voter is located may deposit the ballot and ballot envelope into the mail." 10 Ill. Comp. Stat. 5/19-6.

434 (quoting *Anderson*, 460 U.S. at 789). Accordingly, this portion of Plaintiff's claim fails under the *Anderson-Burdick* framework.

Finally, the Court notes that, in its reply brief, Plaintiff asks the Court to order that the State Board of Elections ensure compliance with the provision of the Election Code specifying who may return mail-in ballots. [55, at 18]. The Court declines to issue such order. To begin, Plaintiff makes this request for the first time in the reply brief. See *Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) (explaining that a "district court is entitled to find that an argument raised for the first time in a reply brief is forfeited"). But more to the point, both Plaintiff and the Attorney General have the same construction of the relevant law: the controlling provision regarding who may return a ballot under the Election Code is 10 ILCS 5/19-6 and neither Section 2B-20(e) nor any other provision of the new law changes this. As the chief executive and law enforcement officers of the state, the Governor and the Attorney General are charged with executing and enforcing the law. The Members of the State Board of Elections and the Commissioners of the Chicago Board of Elections similarly must follow existing law. No court order is needed to compel these officials to do what they already are responsible for doing absent any indication that they have abdicated their duties.

## B.     14-Day Period to Cure and State Holiday

Plaintiff also challenges the constitutionality of the provisions of the May Amendments that create a 14-day period to cure provisional ballots and that create a state holiday for all state workers. Specifically, Plaintiff claims that giving state workers, who primarily vote Democrat, the day off on election day "creates an army of workers to harvest the ballots." [1, at 13]. Plaintiff further asserts that, aided by the 14-day period to cure provisional ballots, this "army of workers with the day off could show up to the polls on election day," cast a provisional ballot under

someone else's name, and then "find the actual voters they impersonated and convince them to present their proper identification to the election authority, so the fraudulent vote would be counted." [*Id.* at 16 ¶ 59]. Therefore, Plaintiff maintains, these provisions of the May Amendments violate the Constitution because they will result in the dilution of Republican votes. In support of this theory, Plaintiff relies on the New York Post article reporting on alleged voter fraud and on an article detailing an investigation that found that the Postal Service pressured supervisors to permit employees to take leave to work on the 2016 Clinton presidential campaign. [6, at 9] (citing Lisa Rein, *Postal Service Broke Law in Pushing Time Off for Workers to Campaign for Clinton, Investigation Finds*, WASH. POST, https://www.washingtonpost.com/politics/postal-service-broke-law-in-pushing-time-off-for-workers-to-campaign-for-clinton-investigation-finds/2017/07/19/3292741c-6ca0-11e7-b9e2-2056e768a7e5_story.html); [55, at 8–12] (citing Levine). But as explained above, the New York Post article focusing on a rogue individual in New Jersey does not provide any basis for thinking that such fraud is likely to occur in Illinois. And the Postal Service investigation details institutional pressure at the United States Postal Service to permit employees to work for a campaign—not institutional pressure in the Illinois state government to commit election fraud. Thus, Plaintiff has not demonstrated any injury caused by these provisions.

On the other side of the *Anderson-Burdick* balancing framework, the Attorney General notes that, during the March primary, privately owned polling places dropped out with little warning, and he explains that closing government buildings would "increase the availability of public buildings as polling places." [49, at 5, 25] (citing Craig Wall, *Chicago Election Board Facing "Monumental Obstacles"; Governor Says Election Will Not Be Delayed*, ABC 7 CHICAGO (Mar. 15, 2020), https://abc7chicago.com/coronavirus-covid-19-chicago-voting-illinois-

primay/6016278).  There is no way of knowing six weeks in advance of the election whether the ebbs and flows of the virus will require last-minute shifting of polling places, so the legislature can hardly be faulted for building extra flexibility into the system.  And the decision to provide 14 days (instead of 7) to cure provisional ballots is a policy judgement that rests comfortably in the province of the legislature.  See *Griffin*, 385 F.3d at 1131.  Therefore, Plaintiff has failed to demonstrate that it is likely to succeed on the merits under the *Anderson-Burkin* framework with respect to these provisions.

### C.      Signature-Based Disqualification

Plaintiff also raises a challenge to the portion of the May Amendments that require three out of three election judges to agree that a signature is invalid before disqualifying a mail-in ballot. [1, at 14–15, 17]; [6, at 8]; [55, at 9–10].  Plaintiff explains that because "no more than 2 [election judges on a panel] shall be from the same political party," at least one election judge will always be a Democrat. 10 Ill. Comp. Stat. 5/2B-20(c); see also [1, at 15].  Therefore, Plaintiff continues, "there will always be one election judge from the Democratic Party with veto power to ensure fraudulent votes are counted, even if the other two judges see clear irregularities."  [6, at 8].

The obvious rejoinder to Plaintiff's concern is that election judges must disqualify ballots without knowing of their contents; judges scrutinize the signature on the *outside* of the ballot and rule on its validity without opening the ballot to see the voter's choices.  See 10 Ill. Comp. Stat. 10 5/19-8(g).  Plaintiff finds this unsatisfactory because in 2016, 75% of Cook County voters voted Democrat so "every fraudulent signature accepted by a partisan election judge has a three-fourths chance of injuring Plaintiff."  [55, at 10].  The Court fails to see how any net effect on the outcome of the election could occur if the signature police will be examining sealed envelopes.  In any event, Plaintiff has not provided any reason to suspect that election judges will commit fraud, let

alone "any concrete evidence" that they will. *Crawford*, 553 U.S. at 201. Of course, any suspicion by an election judge of either party that a judge of the other party has engaged in the kind of systematic subversion of the signature rules that Plaintiff fears could be reported, investigated, and if necessary prosecuted—which should provide a strong disincentive given the balance of risk and reward. Finally, like the length of time provided to cure provisional ballots, the number of election judges required to invalidate a mail-in ballot for an unmatched signature is "quintessentially a legislative judgment." *Griffin*, 385 F.3d at 1131. Accordingly, the challenge to this provision does not satisfy the *Anderson-Burkin* framework.

### D. Age of Election Judges

Plaintiff challenges the portion of the May Amendments that permit individuals who are sixteen years old or older to serve as election judges. [1, at 15]. It asserts that minor election judges will "ha[ve] free reign to rubber stamp signature forgery since 'there is a dearth of Illinois law on the subject of how such signatures should be analyzed.'" [6 at 89] (quoting *Bd. of Educ. v. Pollastrini*, 995 N.E.2d 547, 552 (Ill. App. Ct. 2013)). But Plaintiff makes no attempt to explain why it believes election judges who are old enough to obtain a driver's license are more or less likely to "rubber stamp" fraudulent signatures than adults and thus makes no demonstration of any injury. *Id.* In contrast, the Attorney General explained that "[m]any election judges in Illinois are over 55," and that, in the March 2020 primary election, "many election judges dropped out at the last minute." [49 at 5] (first citing Barbara Sprunt, Wanted: Young People to Work the Polls This November, NPR (Aug. 5, 2020, 5:00 AM), https://www.npr.org/2020/08/05/894331965/wanted-young-people-to-work-the-polls-this-november; and then citing *Illinois' Election to Proceed as Scheduled on Tuesday, Officials Say, Pleading for Volunteers*, NBC 5 CHICAGO, (Mar. 16, 2020, 10:54 PM), https://www.nbcchicago.com/news/local/chicago-politics/illinois-election-to-

proceed-as-scheduled-on-tuesday-officials-say-pleading-for-volunteers/2238393). Creating a larger pool of potential poll workers, including those who are old enough to comprehend their duties as election judges while at the same time likely to be at less risk of complications from COVID-19 due to their relative youth, presents a state interest justifying the rule, particularly when Plaintiff has failed to articulate any injury to its First and Fourteenth Amendment rights. See *Libertarian Party of Illinois*, 872 F.3d at 523–24. This judgment, too, lies well within the discretion of the General Assembly, not to be second guessed by the courts.

### E. Other Challenges to the Election Code

Plaintiff also complains that mail-in ballots need not be tracked and that voters may request absentee ballots "two days later than the U.S. Postal Service recommendation." [6, at 11]. These issues, Plaintiff continues, will disenfranchise voters through lost or delayed mail. [*Id.*, at 11–12]. But, as the Attorney General notes, "this is not a challenge to any specific provision of the May Amendments" because the existing Election Code both did not require tracking and already set the deadline to apply for an absentee ballot. [49, at 16]. Moreover, as the Attorney General further points out, the Cook County Clerk and Chicago Board of Elections provide options for voters to track their ballots. See [*Id.* at 16–17]; *Mail Ballot Application*, COOK COUNTY CLERK, https://mailvoting.cookcountyclerkil.gov ("A voter may confirm receipt of their official ballot by the Cook County Clerk by using the 'What Is My Mail Ballot Status' option of the Voter Information Tool."); *Vote by Mail*, CHICAGO BOARD OF ELECTION COMMISSIONERS, https://chicagoelections.gov/en/vote-by-mail.html (explaining that voter will receive "a unique link to a system to track the ballot through the US Postal Service").

Relying on academic and commission reports, Plaintiff also alleges general infirmities with the entire vote-by-mail system. [6, at 8, 11–12]. This argument is a non-starter for a few reasons.

The authority to weigh the pros and cons of absentee voting and formulate corresponding policies lies with the legislature, not the Court. See *Griffin*, 385 F.3d at 1131. And the legislature's judgment to enact additional measures to encourage voting by mail during a pandemic facilitates the state interest of limiting crowds at polling places for those who are comfortable voting in person while providing a viable alternative for those who are not.

* * *

In sum, Plaintiff has failed to demonstrate that it is likely to succeed on the merits with respect to any of the challenged provisions. As such, the Court need not reach at this time the Cook County Clerk's arguments that the Plaintiff's claims also fail because they are not ripe, because there is no controversy between the Plaintiff and the Cook County Clerk, and because Plaintiff's motion is barred by laches. [53, at 3–7].

### C.  Balance of the Harms

Because the Plaintiff has failed to make the necessary showing on any of the "threshold" elements (see *Valencia*, 883 F.3d at 965), the Court need not proceed to the balancing phase of the analysis. See *Whitaker*, 858 F.3d at 1044. That said, there are two aspects of the balancing phase worth noting. First, Plaintiff waited nearly two months after the enactment of the May Amendments before filing its lawsuit. Such a delay "created a situation in which any remedial order [could] throw the state's preparations for the election into turmoil." *Nader*, 385 F.3d at 736. Second, and relatedly, enjoining the May Amendments approximately six weeks before the election would introduce even greater challenges into what already is an exceedingly difficult election to administer. For example, the Deputy Clerk of Elections for the Cook County Clerk explained that doing so "may present significant difficulties, including with the location of polling places and delivery of voting equipment, the recruitment and training of election judges,

programming of voting equipment and the delivery of ballots to voters." [49-3, at 2]. Moreover, the Cook County Clerk has already "publicize[d] the rules in effect for the November election," and a change could cause voter confusion. [*Id.*]

### III. Conclusion

At its core, Plaintiff's request for a preliminary injunction rests on policy disagreements with the state on how best to handle the convergence of the COVID-19 pandemic with the upcoming election. But the "Constitution is not an election fraud statute," *Bodine*, 788 F.2d at 1271, and the May Amendments amount to "quintessentially * * * legislative judgment[s] with which we judges should not interfere unless strongly convinced that the legislative judgment is grossly awry." *Griffin*, 385 F.3d at 1131. Because Plaintiff's allegations rest primarily on unsupported speculation and secondarily on isolated instances of voter fraud in other states and historical examples from Illinois during the prior century, Plaintiff cannot demonstrate either that it is likely to suffer irreparable harm or that it has some chance of success on the merits. Thus, the court denies Plaintiff's motion for preliminary injunction. [5].


Dated: September 17, 2020 

_____
Robert M. Dow, Jr.
United States District Judge